## Case No. 17,586.

WHITNEY et al. v. The EMPIRE STATE.

[1 Ben. 57.] [1]

District Court, E. D. New York. May, 1866.

COLLISION IN HELL GATE—STEAMER AND SCHOONER—BEATING OUT TRACK—STEAMER NOT STOPPING—EVIDENCE—STATEMENTS OF CREW.

1. The schooner Gold Fish was coming through Hell Gate to New York, on an ebb tide, with a six-knot breeze from W.N.W. She stood over from Negro Point, close-hauled on her starboard tack, till near Hallett's Point, and then tacked off to the northward. Before going but a short distance, she was run into by the Empire State, which was bound from New York. The collision occurred in the afternoon. For the steamboat it was urged: (1) That the schooner, after coming about, ought to have remained in the wind long enough to allow the steamboat to pass her. (2) That the schooner was negligent, in that after she came about she let her sheets flow, and remained in the steamboat's track. (3) That the schooner did not run out her tack towards Hallett's Point. Held, that the circumstances make out a case where the burden of proof is on the steamboat to show by preponderating evidence that she was prevented from passing in safety by some fault in the management of the schooner.

2. It was not the duty of the schooner to remain in the wind. What the law requires of a sailing vessel in a narrow channel is to beat out her tack, and having done so, to come about with all possible dispatch upon the other, leaving to an approaching steam vessel the responsibility of being in a position to enable her to do so without danger.

[Approved in The Northern Warrior. Case No. 10,325. Cited in The Free State, Id. 5,090; The Renovator, 30 Fed. 195; The Servia. Id. 508; The A. W. Thompson, 39 Fed. 116.]

3. Though there may be cases where a departure from this rule would be justified, and even required, the present is not one. No sailing vessel in Hell Gate can be asked to check her headway to enable a steamboat to pass her at Hallett's Point.

4. The weight of evidence is against the defence that the schooner's sheets were loose. Testimony of the men on board the schooner, respecting their own acts, must be considered as outweighing the statements of persons from the steamboat.

[Cited in The Hope, 4 Fed. 93.]

5. The rule requiring a sailing vessel to beat out her tack does not require her in all cases to go as near the shore as the depth of the water will permit, without reference to other exigencies. A schooner tacking above Hallett's Point is entitled to come about in time to insure avoiding the reef at the Point, and the place must vary according to the capacity of each vessel and the strength of the wind and tide.

6. The fact that the answer when put in did not deny the averment of the libel that the tack was properly beat out, is to be considered on a conflict of testimony on that point, even though the answer was allowed to be amended on the hearing by inserting such a denial.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

7. Evidence of conversations with the crew of the schooner is entitled to little weight in determining disputed questions of fact, especially where the statements are denied by the witnesses on the stand, and are inconsistent with the cotemporary act of demanding pay for their vessel.

[Cited in The Hope, 4 Fed. 96; The Roman, 14 Fed. 62.]

8. The steamer was in fault in not stopping in time, and that, having selected the most hazardous course, by not waiting till the schooner had passed her to the northward, and having failed of success in it, she must be held responsible for the damages.

In admiralty.

Benedict, Burr & Benedict, for libelants.

I. T. Williams, Esq., for claimants.

BY THE COURT. This action is brought by the owners of the schooner Gold Fish, to recover damages caused by the sinking of that vessel in a collision with the steamboat Empire State, which occurred at Hell Gate, in March, 1864.

The proofs presented by the respective parties, while they are conflicting as to some of the main features of the case, establish without serious conflict the following facts. The schooner was bound to New York, and reached Hell Gate about 4:30 o'clock, p. m., the wind blowing then a six-knot breeze from about W. N. W. and the tide running the strength of the ebb. The steamboat Empire State was proceeding from New York, and when above Blackwell's Island the persons in charge of her saw the schooner approaching the Gate, close-hauled upon her starboard tack, from Negro Point. The steamboat then sheered and proceeded on toward Hallett's Point, and when near the Point, the wheel of the steamer was put hard-a-port, in order that she might be on a swing to starboard when she should strike the tide at the Point, which, owing to the abrupt turn of the Gate there, flows rapidly past the point, over toward Mill Rock, and at right angles with the channel below. No other change in the helm of the steamboat was made, nor was her engine then stopped, and accordingly the steamboat passed round the Point, swinging as she passed it, till she came head to the tide. While the steamboat was on the turn, the schooner was observed to be coming about. The engine of the steamboat was then stopped and backed, but before the vessel could get sternway on her she came in contact with the schooner, striking her on her larboard side, and cutting her down so as to make it necessary to run her ashore on Ward's Island, where, being loaded with lime, she took fire and burned up. These circumstances make out a case where the burden of proof is upon the steamboat, if she would avoid responsibility for the loss, to show by preponderating evidence, that she was prevented from passing the schooner in safety by some fault in the management of the schooner. This burden has been assumed, and it is contended that the proofs show that the schooner was in fault for not remaining in the wind after she came about long enough to have enabled the steam-

boat to pass by outside of her. There is evidence in the case indicating that this view of the duty of the sailing vessel was entertained by those in charge of the steamboat, and that, in choosing their course for passing the schooner, they relied in some measure upon the schooner's aiding them by remaining in the wind. Indeed, one of the witnesses greatly relied on by the respondent makes the failure of the schooner to do this his principal ground of objection to the navigation of the schooner. But this objection rests upon a misapprehension of the duty of a sailing vessel under circumstances like the present. What the law requires of a sailing vessel in a narrow channel is to beat out her tack, and having beat it out, to come about with all proper dispatch upon the other, leaving to the steam vessel the responsibility of being in a position to enable her to do so without danger. This is the general rule, and although there may be cases where a departure from it would be justified, and even required, the present is not one. In the swift tide and dangerous channel of Hell Gate, no sailing vessel can be asked to check her headway to enable a steamboat to pass her at Hallett's Point. See Twibell v. The Keystone, Nelson, J. [Case No. 14,-285]. This objection to the navigation of this schooner must therefore be overruled.

The next objection taken by the respondent is that the schooner, after she came about upon her larboard tack, flowed up her sheets, and so remained, with her broadside to the steamboat, and directly in her course, when by properly handling her sails she could have gone on past the bows of the steamboat in safety.

A careful examination of the testimony offered upon both sides as to this point has satisfied me that the weight of evidence upon the point is clearly in favor of the libellants. The pilot and crew of the schooner are positive in their statement that the schooner filled away and kept full till the instant of collision, all the sheets except that of the gaff topsail being properly trimmed. This testimony being of the persons actually in charge of the sheets, and respecting their own acts, must be considered as outweighing the statements of persons from the other vessel. Moreover, the statement of the crew of the schooner is confirmed by the fact, which is nowhere contradicted, that the main and jib sheets were both made fast with an extra turn which was not intended to be unloosed in tacking, and which was not unloosed to make the tack in the present case, and which could not, without more delay than here appears, have been unloosed after the vessel came about head to the steamboat. In addition to this, it is to be remarked that the answer makes no allusion to any such fault in the navigation of the schooner, and that the testimony of the crew of the schooner, which was given before the point appeared in controversy, when examined is found incidentally to disprove the charge. I have no hesitation, therefore, in coming to the conclusion that the schooner cannot be held to be in fault in regard to the management of her sails after she came about.

The remaining fault charged upon the sailing vessel, and the one most strenuously urged, is that she did not beat out her starboard tack. The duty of a sailing vessel to beat out her tacks when meeting a steamer in narrow water, is unquestionable; but this rule does not require the sailing vessel in all cases to go as near to the shore as the depth of the water will permit, without reference to the other exigencies of the channel. In beating through a passage like Hell Gate, tacks must be made with reference to the safe passing of points and shoals ahead, and when approaching Hallett's Point with a strong ebb tide, a sailing vessel is entitled to come about in time to insure avoiding the reef at that point, although she may not be at the time of tacking as near the Long Island shore as the depth of the water would permit her to go. The end of the southern tack of sailing vessels from Negro Point is therefore no fixed point, but must vary according to the capacity of each vessel and the strength of the wind and tide at the time. This being so, it seems clear that the opinion of those engaged in the navigation of the sailing vessel, who knew the capacities of their vessel, and can most accurately judge as to the effect which the wind and tide are having upon her, is entitled to more weight, as showing the proper place for the tack, than opinions formed by persons aboard a steamboat approaching from below. In this case the testimony of the persons on board the schooner is positive and emphatic that they proceeded as far upon the tack as it was safe for them to go. The schooner was in charge of a regular Hell Gate pilot of experience, and no circumstance is proved which would make any departure from this course necessary or proper, or which would be likely to lead to any error of judgment. The steamer was in full view, and there was nothing in her method of approaching the tide at Hallett's Point to indicate that she intended to pass to the southward of the schooner. No alarm upon the schooner at the time is shown. She had a fine working breeze, and, as appears in evidence, was a vessel which worked with unusual celerity. Moreover, the whole tack was necessary for her to insure the passage of the Gate, without reference to the presence of an approaching vessel. It would seem to be highly improbable that under such circumstances the pilot of the schooner would have thrown his vessel into the wind before his tack was accomplished, and when her destruction was almost certain to ensue. It would require a very strong array of evidence to satisfy the mind against the positive statements of the persons working the schooner, and against all the probabilities of the case, that so extraordinary a manoeuvre was attempted by the schooner. The evidence introduced by the respondent upon this point I have examined with care. I find some of it positive to the effect that the schooner tacked in mid-channel; other portions of it I find are inconsistent with the testimony given by the libellants; and aft-

er giving to it all the weight to which it is entitled, it has failed to convince my mind that the management of the schooner was faulty in not beating out her tack. With regard to this fault also, I notice that the original answer filed in the cause made no mention of it, and did not deny the averment of the libellants that the tack was properly beat out; and although when the cause was called on for hearing, upon the application of the respondent, the answer was permitted to be amended by inserting a denial of this averment, so that issue is now properly taken upon this question of fact, yet in determining it, the circumstance that while it is now made the principal issue, no such fault was charged by the owners of the steamer when they swore to and filed their answer, is entitled to be considered. If the omission to beat out the tack was then deemed the great fault on the part of the schooner, it is difficult to account for its omission in the original answer, when the facts attending the collision were fresh in the recollections of all.

Looking at the whole case, my conclusion is that the collision in question was not caused by any fault of the schooner, but by the fault of the steamboat in not stopping in time to allow the schooner to beat out the tack and pass the steamer's bows in safety. The testimony of the pilot of the steamer shows this. He states that when he saw the schooner, he determined to pass to the northward of her, and expected her to tack to the southward of him as he was passing, and come out under his stern. The steamboat was accordingly sheered, but not stopped, below Hallett's Point, and when she struck the tide, in passing the Point, was allowed to take it more broadly upon her side than usual, which would have the effect to carry her further to the northward. The effort to time the speed of the steamer, so as to bring her opposite her opposite the schooner at the time of the tack, failed. The schooner, under the full strength of a powerful tide and full breeze, and being, as appears in evidence, an uncommonly quick worker, reached her place for tacking sooner than was anticipated, and when it was impossible for the steamer to pass her bows to the northward as had been intended. The engine was at once stopped and reversed, and with the helm hard-a-port, an effort was made to pass to the southward; but owing to the position which the steamer had assumed in the tide, she could not sheer rapidly to starboard, and before she had time to change her direction materially, the schooner was under her bows. Had the steamer taken up the tide in the ordinary manner, intending to pass to the southward of the schooner, it is quite possible, as the event showed, that she might have passed in safety, for a small sheer would have swung the steamboat sufficiently to have cleared the schooner. But however this may be, had the steamer stopped her engine before she began to pass the point, all possible danger of collision would have been avoided. It cannot be claimed that there was any difficulty in

her stopping below the point; and if, as proved by some of the witnesses, and as conceded by the counsel of the respondent, the tack was made when the steamer was abreast of Flood Rock, it was clearly the duty of the steamer to wait a moment before attempting to pass the point. Having selected the most hazardous course, and having failed of success in it, she must be held responsible for the damages which ensued. In arriving at this conclusion, I have attached little or no importance to the great mass of testimony introduced in the case, relating to conversation had with the crew of the schooner after the accident. This description of testimony, although often proved in actions for collisions, has, in most cases, been held by the court to be entitled to little weight, in determining disputed questions of facts appertaining to the navigation of the respective vessels; and where statements are denied by the witnesses upon the stand, and seem inconsistent with the cotemporary act of demanding payment for their vessel, I dismiss the evidence as of too uncertain a character to be relied on. The decree must be in favor of the libellants, with an order of reference to ascertain the amount of their damages.

[For a hearing on exception to the commissioner's report, see Case No. 4,473.]