WAYNE COUNTY (KENNICOTT v.). See Cases Nos. 7,710, 7,711.

WAYNE COUNTY SAV. BANK (LOW v.). See Case No. 8,562.

---

# Case No. 17,305.

## The W. C. REDFIELD.

### [4 Ben. 227.] 1

District Court, S. D. New York. June, 1870.

COLLISION ON HUDSON RIVER — STEAMBOAT AND SCHOONER—BEATING OUT TACK—HOLDING VESSEL IN STAYS.

1. A steamboat with two barges in tow, one on each side, and a schooner, were both bound down the Hudson river. The schooner was ahead of the steamer, and was beating down, the wind being about ahead, and the tide ebb. Just below the dock at West Camp, the steamer was on the west side of the river, but nearer the middle than the west shore, and the schooner was a short distance below, going to the westward, on her port tack. The steamer starboarded, so as to go under the stern of the schooner; but the schooner, when she had gone but a short distance beyond the line of the course of the steamboat, and without running as far to the west as she could have done, came about. The steamboat immediately stopped and reversed, but without being able to prevent a collision, by which the schooner was sunk: He d, that it was the duty of the steamboat to avoid the schooner, and of the schooner to continue her westward tack as far as was reasonably safe.

[Cited in The Servia, 30 Fed. 507; The Camhusdoon, Id. 710; The A. W. Thompson, 39 Fed. 116. Cited in brief in The Coe F. Young, 49 Fed. 168.]

2. The schooner did not so continue her tack.

3. Even if she did, she was in fault, under the 20th article of the rules for avoiding collisions, in that she was not held in stays long enough to allow the steamboat to pass.

[Cited in The Renovator, 30 Fed. 195.]

In admiralty.

James C. Carter, for libellants.
Robert D. Benedict, for claimants.

BLATCHFORD, District Judge. The libellants, as owners of the schooner Sarah L.

---

1 [Reported by Hon. John McLean, Circuit Justice.]

1 [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

Merritt, bring this suit against the steamboat W. C. Redfield, to recover the sum of $5,000, for the damages sustained by them through the sinking of the schooner by means of a collision which took place between the two vessels on the 9th of October, 1867, between five and six o'clock p. m., in the Hudson river, just below the dock at West Camp. Both vessels were bound down the river. The wind was south, and was about ahead to the schooner, and she was beating. The steamboat had two barges lashed to her, one on each side of her, which she was towing. The schooner was ahead of the steamboat. The tide was ebb, or with both vessels. The libel alleges, that the schooner had finished her tack to the westward, and gone about on her tack to the eastward, which was her starboard tack, and was sailing close hauled, when the steamboat struck her on her port side, a little aft of midships, and crushed it in, the bow of the steamboat running up on her deck, and that the steamboat remained in that position until the schooner sank from under her.

The answer sets forth, that the channel, at the place in question, is about three-quarters of a mile wide, and extends close to the west shore; that the steamboat, which was a propeller, was on the west side of the river, but nearer the middle than the west shore; that the schooner stood across the river, and across the line of the direction of the steamboat, to the westward, on her port tack, a short distance below the steamboat; that, as the schooner was so standing across the river, on a course to the westward, the helm of the steamboat was put to starboard, for her to pass under the schooner's stern, which she would have done at a safe distance, if the schooner had run out her tack to the westward; that the schooner, instead thereof, continued on that tack only until she had passed less than her length to the westward of the line of direction of the steamboat and of the barge on the starboard side of the steamboat, and then came about and stood on her starboard tack to the eastward, across the river, and across the bow of the steamboat, from a point so near to the line of direction of the steamboat and of the barges in her tow, and at so short a distance below the steamboat, that, although the steamboat's engine was immediately stopped and backed, on observing the man at the helm of the schooner putting it hard down to come about, the collision followed; that the schooner sank after she had been shoved by the steamboat in toward the shore as far as it was safe for the steamboat to shove her, and after a line had been got ashore from the schooner; that the schooner had abundant unobstructed room in the channel to continue on her tack to the westward for a much greater distance, and to run out her course, and ought to have done so; that her coming about and standing to the eastward before she had run out her tack, was without necessity or justifiable excuse, and not to be expected by those navigating the steamboat; and that the persons navigating the

steamboat hailed the man at the schooner's helm, who was the only man on the deck of the schooner, not to put his helm down, or to that effect, on observing that he was doing so to come about.

It was the duty of the steamboat to avoid the schooner, and it was the duty of the schooner to continue, on her tack to the westward, to run, before coming about, as far as was reasonably safe. The case turns upon the question as to whether the schooner came about improperly at the place where she did come about after running to the westward, and whether she might have stood, and ought to have stood, further to the westward, and whether her coming about was a thing not expected, and which could not reasonably have been expected, by the steamboat. It is contended, on the part of the libellants, that the weight of the evidence on these questions, by the preponderance of the witnesses both in number and quality, is greatly with the libellants. There are three classes of witnesses in the case—those who were on the schooner; those who were on the steamboat, or the barges in tow of her; and those who were on shore, or on another schooner below in the river, going down. The witnesses from the shore are two in number, and are witnesses for the libellants. One of them, De Witt, was on the east bank of the river, nearly a mile off from the schooner when she went about from her tack to the westward, and he does not say that he saw her go about, or state where she went about, or how far she stood to the westward. The other witness, McGee, puts himself not far from an eighth of a mile from where the schooner went about, his place of observation being about one hundred yards inland from the edge of the water. But his testimony as to the place where the schooner went about could not have been the result of any particular attention at the time, for he says, that, when he saw the schooner come up in the wind, it did not occur to him that there was any chance of a collision. He says he thinks that the schooner stood in as far as it was safe for her to stand, without grounding, and as far as any vessels do in beating. The witnesses from the other schooner are two in number, her master and her mate, and are witnesses for the libellants. Their schooner was beating down the river ahead of the Sarah L. Merritt. They say that they went about on the west side shortly before the Sarah L. Merritt went about, and about one hundred yards to the windward of the Sarah L. Merritt, and that they were about three hundred yards away from the place of collision. They unite in saying that the Sarah L. Merritt stood as far as was safe to the westward.

There were two persons on the deck of the schooner when she went about—the man at her wheel, and her steward. The former alone has been examined as a witness. He had never been in that part of the Hudson river before this occasion. He had no experience to guide him, and nothing by which to tell how

far he could safely stand to the westward except the general view and the example of the schooner that was ahead. He saw her tack first, he says. There is a flat between the channel and the land on the western side, and the evidence goes to show that there is no reliable guide by which to tell the line of the channel on the west, except to take a range from an object on the land above to one on the land below. The man at the wheel of the schooner had, of course, no knowledge of any such range. He probably tacked when he thought he had stood as far to the westward as the other schooner had stood. The captain of the libellants' schooner and one other of her hands have been examined for the libellants. Both of them were below when the schooner went about, but they were on deck at the time of the collision. Of the two, the captain alone knew anything of the channel. The captain's testimony is very much open to criticism in regard to its general credibility, because of his manifest tendency to exaggeration. This shows itself in his saying that he could see the grass on the flats, as marking the boundary of the channel at the place in question; that there is a reef of rocks putting out from the western bank of the channel, opposite where the schooner tacked, and extending out for ninety feet to the eastward beyond the easterly line of the dock at West Camp; and that he in vain asked the people on the steamboat, after the collision, to shove the schooner upon the bank where the flats slope into the channel on the west side of the river. The man at the wheel of the schooner also justifies his going about where he did, on the ground that he saw the eel-grass in the water, even with the surface of the water, as marking the edge of the channel, and that he stood over to within a length and a half of the grass. As to the grass, the libellants' witness De Witt, who lives on the east shore, opposite the place of collision, and is familiar with the channel, by having fished and sailed about there, says that there is no grass growing on the flats there; and on the whole evidence, on both sides, I am satisfied that there is no grass to be seen there, and no reef extending into the channel. The evidence also shows that, after the collision, the steamboat did shove the schooner same distance towards the west bank, and as far towards it as was possible, in order to prevent her sinking in deep water.

On the part of the steamboat, her master, and her pilot, who was at her wheel at the time, and her engineer, have been examined as witnesses; also the captain of her starboard barge, who was on board of that barge; and the captain of her port barge, who was in the pilot house of the steamboat. The substance of their testimony is, that, when the steamboat was passing down by the West Camp dock, both of the schooners were standing to the westward, below the steamboat, the more southerly one being the nearer one to the west shore, and the more northerly one being the one that the steamboat afterwards struck; that, when

that schooner was still to the eastward of the steamboat, and on her tack to the westward, the pilot of the steamboat starboarded his helm, so as to be sure and pass safely to the eastward of and under the stern of the schooner, as she was going towards the west shore, and, when he saw that he would go clear, eased his starboarding; that the schooner had gone but a short distance to the westward beyond the line of the course of the steamboat and her barges, when the pilot of the steamboat saw the man at the wheel of the schooner put her helm down to come about; that he immediately rang the bells of the steamboat to slow, and stop, and reverse her engine; that these bells were immediately obeyed, and the engine was backing when the collision occurred; and that, while the schooner was still in the wind, with her sails shaking, the master of the steamboat, from his forward deck, seeing the man at the wheel of the schooner, and seeing that he had got the wheel down, and that the schooner was going about, cried out to him to right his wheel, and not to go about there. The man who was at the wheel of the schooner says that he did not hear this hail, nor a hail made by the pilot of the steamboat. But it is in proof that both of those hails were made. The master and the pilot of the steamboat and the master of the starboard barge, all of whom appear to be experienced men, acquainted with the navigation at the place where the schooner went about, say that she could safely have stood some distance further to the westward. It would have required her retardation but for a short interval of time, to enable the steamboat and her barges to pass in safety. As those on the steamboat and her barges had just passed West Camp dock, the pilot of the steamboat and the masters of the two barges, one of whom was on his own, the starboard, barge, and the other of whom was in the pilot house of the steamboat, at the time, and all three of whom were observing the schooner and her movements, are more reliable witnesses as to the distances from the west shore, of the place where the schooner went about, and of the place of collision, than any of the witnesses for the libellants could be, except those on board of the schooner. For the reasons already given, the only two witnesses from the schooner, her captain and the man at her wheel, who give any evidence on the subject of those localities, are overborne largely, as to the quality and the weight of their testimony, by the witnesses from the steamboat and her barges.

One circumstance is entitled to much weight. The pilot of the steamboat was alive to his responsibility. As the schooner was passing to the westward, he starboarded, so as to be sure and go under her stern, and then he passed on, entertaining, it is clear, from his non-action in view of what he saw, no idea that there was any danger of a collision with the schooner on her next subsequent tack. There is nothing to show that he either had, or ought to have had, any idea that there was a risk of such a col-

lision, calling upon him to make some manoeuvre to avoid it, before he saw the schooner's helm put down. If he had entertained such an idea, his proper manoeuvre would have been either to starboard still more, or to port, and in either event to stop and reverse also. But he did no one of these things before he saw the schooner's helm put down, and he refrained from action evidently because he saw, from his knowledge of the channel, that there was a free course for him to go by, if the schooner did not improperly come back across his track. Any other view involves the conclusion that he recklessly went on when he must have seen and known that a collision was almost certain. There is nothing in the evidence to warrant that conclusion; and the contrary view only involves the inexperience and ignorance of the man at the wheel of the schooner, which are abundantly established.

There is another view. It was the duty of the schooner to keep her course, but she is not absolved from the consequences of the neglect of any precaution required by the ordinary practice of seamen, or by the special circumstances of the case. Act April 29, 1864, art. 20 (13 Stat. 61). Now, whether she did or did not stand to the westward as far as she could run with reasonable safety, her coming about and getting on a course to the eastward involved two things, beyond a cessation of her movement to the westward, namely, a shaking in the wind before filling off on her new tack, and such filling off. Wherever the place of her shaking in the wind was, with reference to the western bank of the channel, it was in fact, as shown, a place where the water was sufficiently deep for her, and the west bank of the channel from there runs straight for some distance down; and, on the testimony in the case, even that of the master of the other sailing vessel, the schooner could have been held in stays, by competent management, for some length of time—long enough, I am satisfied, for the steamboat and her barges, going as they were at good speed, to have passed safely by.

On the whole. I think that the steamboat has excused herself from fault in respect to this collision, and that the libel must be dismissed, with costs.