# THE SERVIA.

# THE NOORDLAND.

## NICOLLS v. THE SERVIA.

## CUNARD S. S. Co., Limited, v. THE NOORDLAND.

*(District Court, S. D. New York. April 4, 1887.)*

1. COLLISION—BETWEEN STEAMERS — GETTING UNDER WAY — BACKING OUT OF SLIP—RULES OF NAVIGATION, WHEN APPLICABLE.

   A steam-propeller while backing out of a slip, and two-thirds of a mile across the river upon a defined course, for the purpose of turning about, is not entitled to the immunities of a vessel getting under way, but is bound by the rules of navigation as respects other vessels. So far as practicable, the rules are to be applied according to her line of motion, treating, for the time being, her stern as her head, and her starboard side as her port side.

2. SAME—CHANGE OF COURSE BY REVERSING.

   A backing steamer, proposing to change her course by reversing, is, upon stopping her engine for that purpose, in a situation analogous to that of sail-vessels tacking when beating in similar rivers or narrow streams, and, like the latter, is bound to use reasonable dispatch in order not to mislead or obstruct other vessels navigating in the vicinity.

3. SAME—STOPPING AND BACKING—RISK OF COLLISION—WHEN IT ARISES.

   A vessel bound to keep out of the way has a right to assume that the other vessel will perform her duty, and pursue the ordinary and customary course according to the special circumstances. She is not bound to stop and reverse until there is reasonable cause to apprehend some danger of collision.

4. SAME—CASE STATED:

   The steamer N., 480 feet long, backed out of her slip at Jersey City, straight across the North river, for the purpose of turning down and going out to sea. When in mid-river, her propeller was stopped, when she gave a signal of two whistles indicating that she would go ahead under a starboard wheel. The steamer S., 520 feet long, was at the same time coming down the North river, near the New York shore, and saw the N. when she stopped her propeller, and understood her purpose. The S. continued going down slowly not more than 800 or 1,000 feet from the New York shore, there being other vessels between her and the shore. The N. continued running out her stern way, did not set her engines in motion for two minutes after they were stopped, then put them ahead at half speed, and two minutes afterwards at full speed. Within a minute after, the bow of the S. struck the round of the N.'s stern not over 800 or 1,000 feet from the New York shore. The instructions of the N. were not to go more than two-thirds across the river. She considerably exceeded that limit and it was not usual to go so near unless the navigation was clear and unobstructed. The S., when she saw that the N. did not go ahead, as was expected, stopped, and afterwards backed at full speed, and was nearly still at the collision, while the N. still had a little sternway. *Held*, that the two vessels were to be judged according to the ordinary rules of navigation, treating the N. in reference to her line of motion, and that the N. was solely in fault (1) for going so near the New York shore unnecessarily; (2) for exceeding the usual limits in such navigation; (3) for not using reasonable dispatch in going ahead after she had signified her intention to do so in mid-river; (4) because the S. had no reason to apprehend any collision, as she could not anticipate that the N. would continue backing so far; (5) and because the S. did all that was in her power after she had any reason to apprehend danger of collision.

In Admiralty. Cross-libels for damages resulting from a collision.

*Owen & Gray* and *Frank D. Sturgis*, for the Servia.

*Biddle & Ward* and *John E. Parsons*, for the Noordland.

BROWN, J. The above cross-libels were filed to recover the damages sustained by the respective owners of the steamer Noordland, of the Red Star Line, and of the steamship Servia, of the Cunard Line, through a collision which took place between those steamers in the Hudson river, at about 2:44 P. M. of January 30, 1886, some 200 or 300 yards from the ends of the piers, and about opposite Liberty street. Both steamers had started to proceed to sea upon their regular trips. The Servia had backed out of her slip at the foot of pier 34, North river, and had got turned about and straightened down river, when near the New York shore off Chambers street, while the Noordland was at the same time backing across the river from out of her slip at Jersey City for the purpose also of turning down river. The wind was moderate from the northwestward. The Noordland's jib and staysail were set to aid in turning her bows to the southward, and a tug was also employed on the port side of her stern in order to shove her stern up river as much as possible, and counteract the effect of the right-handed propeller of the Noordland in backing, which would naturally cant her stern down, and her bow up. When she had reached about mid-river, her engines were stopped to allow her to run out her sternway. At about the time her engines were stopped, a signal of two whistles was given to the Servia, meaning, as the captain states, that the Noordland would starboard her wheel and go ahead. The Servia, at that time, was as he estimates, about four lengths up river, that is, nearly 2,100 feet distant, and, as the pilot says, bearing three or four points aft of their beam. Two minutes afterwards, as the log would indicate, the engines of the Noordland were put ahead, and the Servia's engines in the mean time were reversed full speed. The Servia's stem, however, struck the round of the fantail of the Noordland's stern, some 15 feet forward from its extreme end, and penetrated the Noordland about 15 feet, doing her very considerable damage, and to the Servia but slight injury, on the starboard only.

The Noordland claims that the Servia was in fault because the latter had the Noordland on her starboard side, and was therefore bound to keep out of the way, which she did not do. The master of the Servia considered that he had the right of way because he was on the starboard side of the Noordland, and was as near to the New York shore as it was safe for the Servia to go, and because the Noordland had no right to come by backing so near to the New York shore as to prevent vessels passing up or down.

The rules of navigation cannot be applied literally to vessels backing. The terms do not fit. A ship's starboard side is always her starboard side; her port side is her port side, whether she is going ahead or astern. If the Noordland were intending to back across the Servia's path, each, having the other in fact upon her own "starboard side," would, by the letter of the crossing rule, (article 16, old rule 19,) have been bound to keep out of the way of the other; while by article 22 (old rule 23) each would have been bound to keep her course, which is a contradiction. The rule as to crossing courses presupposes that, if A. is on B.'s starboard side, B. must be on A.'s port side. It follows, therefore, that the case

of a vessel backing must either be treated as *casus omissus* under the rules, or else the statutory rules must be applied in reference to the vessel's line of motion, for the time being, treating her stern, while she is backing, as her bow, and her starboard side as her port side.   The latter result would, I think, follow if the case were regarded as not provided for by the statutory rules.   It would then be governed by the maritime rules prevailing anterior to the statutory enactments; steamers being treated like sailing vessels with a free wind, the one having the other on the starboard side of her line of motion being required to keep out of the way, and the other to keep her course.   In the case of *The Galileo*, 28 Fed. Rep. 469, it was observed by the circuit judge that "it is doubtful whether the nineteenth rule of navigation applies to a case where a vessel under steam, lying nearly cross-wise near the middle of a navigable channel, is not on a defined course crossing that of another vessel under steam, and having the latter on her starboard side, but is attempting to turn about by backing, and then going forward for short distances." Such maneuvers, restricted within narrow limits, scarcely amount to more than an attempt to get under way, and the crossing rule would not seem applicable to a steamer, more than to a sail-vessel, that is not fairly under way.

The Noordland in this case, however, was not in the situation of a vessel getting under way, or of a vessel without a defined course.   She wished, indeed, to get headed to the southward in order to proceed down the bay.   Instead of using any of the various practicable methods for doing so at her slip, or in its immediate vicinity, she preferred to run back about two-thirds of a mile nearly straight across a busy thoroughfare, to a point from which, upon going ahead, she could swing round in one sweep to her desired course.   During this long stretch backwards, her engines were working astern at half speed for six minutes, and at full speed for three minutes.   The practice is common. Her course was, in general, well defined; it was her intended course, and was understood and anticipated by both vessels, except as to its limits.   In pursuing such a long backward course for her own convenience, a steamer is not entitled to the immunities of a vessel that is merely getting under way, but must be held subject to the rules of navigation, so far as practicable, applied according to her own line of motion; otherwise she would be allowed to navigate a considerable distance subject to no rule whatever, to the imminent peril of all other vessels.

If, therefore, the Noordland had a right to back across the path of the Servia, and run so near to the New York shore, and was designing to do so; or if the Servia had any just reason to suppose that such was the Noordland's intention, I should be bound to hold the case covered by the crossing rule, (article 16, old rule 19,) and the Servia consequently in fault for not having kept out of the way, by stopping in time, as she might have done, and doubtless would have done, had she anticipated that the Noordland would back so far.   But I am satisfied, upon all the evidence, considering the usage and the practice as regards backing, and the circumstances and necessities of navigation in this harbor, that not

only had the Noordland no right to back so near to the New York shore as she did, but that it was not the intention of her master or of her pilot to do so; that they did not intend to cross the path that the Servia was taking, near the New York shore; and that the officers of the Servia had no reason to anticipate the Noordland's near approach, but had abundant and special reason to the contrary; and that as soon as they had any reason to apprehend danger they did all they could to avert it.

The master of the Noordland testified that his instructions were to run about two-thirds across the river, and that for that purpose he stopped the reverse action of his engines at about mid-river. The signal of two whistles were given to the Servia, as the master says, at about the same time, meaning that he was going to starboard his wheel and go ahead. The pilot says he sounded this signal just before stopping. The engineer's log shows that it was two minutes after the reversed action of the engines were stopped before they were put ahead. The signal appears to have been heard by the lookout of the Servia, but not by her officers on the bridge. They saw her propeller stop, however, when the Noordland was about in mid-river, and understood that it was her intention to go ahead under a starboard wheel in order to get headed down the bay. Capt. McKay, of the Servia, testified that it was the practice "to burrow well on the New York side. If the river is perfectly clear, they come well across,—one-half or one-third across, or just to clear the wharves." The nearer the backing steam-ship can come towards the New York shore, the more convenient it doubtless is for her to reach her southerly course by a single sweep. But it is in no way essential that she should come much beyond mid-river; certainly not more than two-thirds across, which was the limit, according to the Noordland's instructions.

At this time the river was not "clear of vessels," since not only were there other small vessels in the vicinity of the wharves, but the Servia, one of the very largest that come into this port, was approaching near, and was entitled to more consideration from the Noordland than smaller vessels. It would be a most unreasonable claim that a vessel of the size of the Noordland, nearly 500 feet long, might without any necessity approach the New York piers so as practically to obstruct navigation there, or render it perilous while she was lying athwart the stream, and until she should change her course, and go out of the way. Her duty was to make her operations in turning as safe to other vessels, and as little of an obstruction to navigation as was reasonably practicable. This plainly required her to leave a reasonably free passage for vessels to go up and down near the New York shore. The practice testified to, as well as the Noordland's instructions, agree in this conclusion; and the evidence leaves no doubt that it was the expectation on each of these vessels that the Noordland would conform to this rule.

The weight of testimony is clearly to the effect that the stern of the Noordland, at the time of the collision, was certainly not over 300 yards from the end of the piers, and probably considerable less. The river there, from pier to pier, is about 4,400 feet wide. She had crossed, therefore, about four-fifths of the stream. Besides a great number of

witnesses from the Servia, who estimate even a nearer approach to the New York shore, the witnesses from two ferry-boats that were waiting near by for the passage of the Servia, and the witnesses from the tug abreast of and to the eastward of the Servia at the collision, seem to me to leave no doubt on this point. The Servia, having first obtained her southerly course near the New York shore, continued to shape her course as near to the shore as I can find was safe or justifiable for a vessel of 7,000 tons. At the collision, when she had almost stopped by reversing, she was estimated at not over 100 yards from a tug and other vessels to the eastward of her. From this it appears that the course designed and taken by the Servia lay about a quarter of a mile to the eastward of the position of the Noordland when her propeller was stopped reversing, preparatory to going ahead and turning to the southward. This distance was observed by the officers of the Servia, and the Noordland's intention to stop and go ahead was observed, and was understood by the Servia's officers, as clearly as if they had heard the two blasts given at about the same time by the Noordland, and designed as an assurance of that intention. In that situation, the Servia had the right to assume that she was safe in going on as she did. There was no apparent danger. There was no apparent crossing of courses designed,—no apparent possibility that the Noordland would interfere with the Servia's course so far to the eastward. Aside from the blasts of the whistle not heard, the practice testified to, and the stopping of the Noordland's reversed propeller in midriver, were a practical assurance to the Servia that the Noordland would not crowd upon her course. The Servia shaped her course so as to give the Noordland a wide margin, and more than she needed. The Noordland had abundant space and means for going ahead, as her movements and her signal showed she intended, and there was nothing to prevent her accomplishing her apparent intention. It was her evident duty to do so.

In the case of *The Ulster*, 1 Marit. Law Cas. 234, Lord CHELMSFORD in the privy council says of the Tagus, which, though crossing the Mersey, was intending to turn down the stream, that the Ulster "was entitled to take for granted that the Tagus, intending to turn her head down the river, would resort to all the means proper for the purpose, and would have no difficulty in succeeding in her object. The Ulster pursued the safe and proper course of not shifting her helm, under the reasonable expectation that the Tagus would do what she evidently proposed to do, and which she had the means at command of accomplishing." And on that ground the latter was held wholly in fault.

In the case of *The Baltic*, 2 Ben. 98, where the steam-boat Flora was backing out of the slip at pier No. 1, East river, and collided with the ferry-boat Baltic, BLATCHFORD, J., says:

"The Baltic did everything she was bound to do, by slowing to half speed, and then stopping, and then backing, to avoid the collision. That she did not do more—as, for instance, that instead of stopping at once the moment she saw the Flora backing at a distance off which then was perhaps half a mile, she slowed to half speed—was no fault on her part. She could have had no reason to suppose that the Flora would keep on backing so as to

make a collision probable. She slowed to half speed the moment she saw the movement of the Flora, and she stopped and backed as soon as she had any reasonable ground for apprehending that a collision was imminent. There was nothing in view from the Baltic as a cause for the backing of the Flora, and nothing to indicate that there was or would be a necessity for the Flora to back to the extent she did."

See, also, *The W. C. Redfield*, 4 Ben. 227, 233, 234.

The observations quoted in each of the above cases seem to me precisely applicable here. When the Noordland stopped her propeller in mid-river, a quarter of a mile to the westward of the course that the Servia had shaped for herself, and four minutes before the collision, the Servia had not the slightest reason to suppose that the Noordland would back so far, nor was there the slightest necessity for it. The Servia was already going slowly, not more than at the rate of from four to six knots. Shortly afterwards her engines were stopped,—a proper measure of precaution, as was observed in the case of the Baltic. A little after, seeing the Noordland still going astern, her engines were reversed full speed; and at the collision it is evident that her headway must have been very nearly stopped, or so heavy a vessel would have penetrated the Noordland even more than she did. In the case of *The Ada*, 28 Law T. (N. S.) 825, referred to by the counsel for the Noordland, the vessels were properly held to be *crossing*, because both had to reach the pilot-boat as a common point, which both could not occupy at once, and from which each was to go ahead upon the same course.

The true cause of the collision was the unnecessary and unjustifiable delay of the Noordland in putting her engines ahead after she had stopped reversal in mid-river. I think the Servia's witnesses are probably mistaken in supposing that the Noordland's engines again backed afterwards. But the log shows, as I have said, that, after stopping in mid-river, it was two minutes before they were put ahead at half speed, and two minutes more before they were put full speed ahead,—the latter probably not a minute before collision. From the statement of the pilot that the Noordland's speed, when she stopped backing in mid-river, was only about two and one-half knots, it is possible that this great mistake as to her speed backwards may have induced the fatal delay. The evidence leaves no question in my mind that at that time she was going at the rate of five or six knots. The Noordland was but nine minutes in passing from the mud bank just outside of her wharf, at the start, to the middle of the river,—a distance of some 2,000 feet. For three minutes during the last part of this interval her engines were going full speed astern. Two ferry-boats also left their docks at Jersey City a short distance only behind the Noordland, and, according to the testimony of the witnesses, they did not materially approach her in reaching the middle of the river; and the distance from mid-river to the place of collision, some 1,200 or 1,400 feet at least, was passed over in four or five minutes, though her engine was going half speed ahead from two to three minutes. These circumstances altogether leave no doubt that the Noordland in mid-river must have been going at the rate of five or six knots. In proportion,

however, as her speed was considerable, was her duty to be diligent in starting ahead after she had stopped her engines backing, when likely to interfere with the passage of vessels on the New York side. I can find no excuse for—*First*, the delay of two minutes in putting her engines at half speed ahead; and, *second*, for the delay of two minutes more before putting them full speed ahead.

A steamer backing, as in this case, for the purpose of reaching a point from which she may go ahead, and swing around upon her desired course, when she has nearly reached the point desired, and the usual position for changing, and when she indicates her purpose by stopping the propeller's backward motion, is in a position substantially analogous to that of a sailing vessel in beating, that indicates, in the usual place of tacking, that she is going to tack and come about. The obligation of a sailing vessel in that situation is to use reasonable dispatch in coming about in order not to obstruct nor to mislead other vessels obliged to navigate in reference to her. 1 Pars. Shipp. & Adm. 578, 579; *The Empire State*, 1 Ben. 57, 60. There can be no doubt, I think, that a similar duty, and for the same reason, rests upon a steamer backing across a river, and designing to change her course. Otherwise vessels in her neighborhood could not know upon what they must count, nor whether to attempt to go upon one side of her or to the other. The Noordland, from the time she reached mid-river, and had indicated her intention of going ahead, instead of using reasonable diligence in doing so, was, as it seems to me, dilatory to the last degree. This made all the just calculations of the Servia futile, and, as I think, was the sole responsible cause of the collision.

The Servia reversed, as required by the approaching rule, (article 18, old rule 21,) as soon as she had any reason to apprehend danger, and, as I have said, was very nearly stopped at the time of the collision; while the fact that the wound in the Noordland's hull shows that its after edge is much more inclined towards the horizontal than the forward edge is, and the further fact that the rubbish inside the Noordland is all piled along the forward line of contact, and none along the after line, as well as the injury to the Servia's starboard bow only, prove pretty conclusively that the Noordland must have had some sternway even at the moment of collision. The Servia's bows were probably canted a point to the westward through the influence of her propeller while reversing. But I do not think this had any material effect in producing the collision, or that the vessels would have cleared but for this slight change of heading. The canting was in fact caused by the swinging of the stern, and the rotating point is always much nearer the stem than the stern. Her forward movement, while she was backing, was but slight,—not enough to make any material difference in the position of her stem on a line east and west.

Finding that the Servia did all that the law required of her, and was without fault, and that the collision arose through the unjustifiable delay of the Noordland in going ahead, I must dismiss the Noordland's libel, and allow a decree in favor of the Servia, with costs.