THE CAMBUSDOON.

THE CHARLOTTE WEBB.

CALLAHAN and others *v.* THE CAMBUSDOON.

KENNEDY and others *v.* THE CHARLOTTE WEBB.

*(District Court, S. D. New York. April 14, 1887.)*

1. COLLISION—PILOT-BOATS—RULES OF NAVIGATION—ANSWERING PILOT'S SIGNALS—UNEXPECTED MANEUVERS.

A vessel at sea upon pilotage ground is subject to the usual rules of navigation, as respects a pilot-boat whose signal offering services she has not answered, and whose services she does not desire. She is not in fault for observing the usual rules in endeavoring to keep away from the pilot-boat, though the latter may be navigating for the purpose of coming within hailing distance; nor for not guarding against dangerous maneuvers of the pilot-boat

that could not be foreseen or expected. It is not a legal fault to give no answer to a pilot's flash-light, offering her services, there being no rule or fixed custom requiring an answer.

2. WITNESS—EXAMINATION—CREDIBILITY.

In a conflict of testimony comparatively little weight is to be attached to the statements of witnesses in their own behalf, upon critical facts, differing from their first statements, and drawn from them by the strenuous pressure of leading questions by their own counsel.

3. COLLISION—PILOT-BOAT AND BARK—KEEPING AWAY—FOURTEENTH RULE.

The pilot-boat C. W., in a clear, dark night, about 15 miles off the Jersey coast, seeing the green light of the bark C. off her starboard bow, bearing about S. W. by S., for the purpose of hailing her and tendering services as pilot, stood to the westward on her port tack, and crossed the C.'s bows for the purpose of going down upon the windward side. When she had brought the C.'s bearing to S. E. by S., the pilot-boat came about on her starboard tack, heading S. S. E.; but, after proceeding two or three lengths, supposing that the bark was rounding to the westward, and luffing for the purpose of receiving the pilot, put her helm to starboard, to cross the bark's bows again, and go down upon her lee side. While thus crossing her bows, she came in collision with the bark. The bark had already taken a pilot on board, and did not answer the pilot-boat's flash-light, to indicate that no pilot was desired, by exhibiting a white light a few times, as is sometimes done, but changed a couple of points to the eastward, as she saw the pilot-boat standing across her bows to the westward, and, after the pilot-boat had crossed, swung back to her course, and perhaps half a point beyond. The bark was purposely proceeding slowly, and her sails were not trimmed as usual. Just before the collision, she again veered to the eastward, to keep away from the pilot-boat, which seemed to be coming dangerously near on her port side. *Held*, that the collision was due solely to the dangerous maneuvers of the pilot-boat; that her inference that the bark was luffing, drawn from the bark's swinging back to her course, and from the trim of her sails, was unwarranted; that the pilot-boat was not justified in again attempting to cross the bark's bows to the eastward, before the bark's purpose to luff was made reasonably certain, by showing both her colored lights, which she did not do; that the pilot-boat's starboarding was not required for her own safety; and that the bark was justified, under the fourteenth rule of navigation, in both changes of the helm, to keep out of the pilot-boat's way, as the bark was sailing free, and had the wind on her port side, and the pilot-boat's last change was unreasonable and not to be expected.

In Admiralty.

*Jas. K. Hill, Wing & Shoudy,* for the Cambusdoon.
*Whitehead, Parker & Dexter,* for the Charlotte Webb.

BROWN, J. The above cross-libels were filed to recover the damages sustained, respectively, by the owners of the pilot-boat Charlotte Webb and the British bark Cambusdoon, through a collision that occurred about 1 o'clock in the morning of April 2, 1886, off the coast of New Jersey, about 15 miles S. S. E. of the highlands of Navesink. The pilot-boat was intending to hail the bark in order to tender her services, but was run down by the bark while crossing the latter's bows to the eastward; the bark's bowsprit and stern striking the pilot-boat just abaft of the fore-rigging, carrying away her mast, and breaking in her side.

The night was dark, but clear and pleasant, with a moderate breeze from the south-west. The bark was 193 feet long, deeply laden, drawing 22 feet of water, and had already taken a pilot on board. On account of her great draught of water, her pilot did not wish to arrive at the bar at Sandy Hook until about high water, at 6 o'clock in the morn-

ing. She was therefore proceeding slowly, at the rate of not over three and one-half knots, with her mainsail hauled up, her top-gallant sails down upon her caps, and her royals clewed up; and, the wind having shifted not long before, her yards had not been trimmed. The pilot-boat was under reefed foresail and mainsail, with her jib and staysail set.

The account of the collision, as stated in the libel of the pilot-boat, and as testified to by her witnesses, is, in brief, that, having first made the bark's green light bearing about S. W. by S., the pilot-boat was put upon her port tack, heading W. ½ N.; that she kept on that course, after crossing the bows of the bark, until the latter bore S. E. by S. when the pilot-boat came about upon her starboard tack, heading S. S. E., for the purpose of going down upon the windward side of the bark, as customary, to hail her; that, about the time she got upon her starboard tack, the bark was thought to 'be luffing, and rounding to the westward, from which it was inferred that the bark desired to take a pilot aboard; that acting on that inference, in order to go upon the bark's lee side,—that is, her starboard side,—where it was usual to take the pilot on board, the pilot-boat put her helm hard a-starboard, after running only two or three lengths on the course of S. S. E., so as again to cross the bark's bows to the eastward; and that she would have done so safely, had not the bark then ported her wheel so as to follow up the pilot-boat in her turn, which brought about the collision. The faults charged upon the bark are that she misled the pilot-boat by first luffing to the westward, and thereby inducing the belief that a pilot was wanted on board, and leading the pilot-boat to cross the bark's bows to the eastward; and, *second*, by afterwards porting her wheel.

On the part of the bark it is claimed that she did nothing to mislead the pilot-boat, or to warrant any inference that she was luffing, or rounding to, or desired to take a pilot on board; that, though the pilot's flash-light was twice seen, no signal in return was given to indicate that a pilot was desired; and that the only changes in the bark's course were that she first veered two points to the eastward,—that is, to N. N. E.,—when the pilot-boat first crossed to the westward, in order the more effectually to keep away from the latter; and, after the pilot-boat had got three points on her port bow,—that is, bearing N. by W.,—that the bark came back again to her proper course of N., swinging in the process not more than half a point to the westward of N.; and that afterwards, just before the collision, when the pilot-boat was seen coming dangerously near on the bark's port side, she again ported her wheel, for the purpose of keeping away from the pilot-boat, under which she also changed but two points, so as to head N. N. E., at the time of the collision.

The evidence shows that it is a very common practice, where a pilot has been previously taken on board, to indicate that fact by exhibiting, in answer to a pilot-boat's signal offering her services, a white light two or three times in rapid succession. That was not done in this case. Had that answering signal been given by the bark, doubtless this collision would have been averted. It was not given, as the pilot of the bark says, because, after the pilot-boat had crossed to the westward, there was

not time to get the light, and exhibit it. There was time, however, had he directed it to be done when the pilot-boat's flash-light was first seen on the starboard bow. The omission to give this answering signal is not charged as any fault in the libel. There is no regulation requiring such a signal. The practice, as appears from the testimony, does not amount to a fixed custom, and seems to be only a matter of conventional courtesy, optional among the pilots themselves, and not amounting to any legal obligation chargeable upon the ship.

The primary cause of the collison was manifestly the last change of the pilot-boat in putting her helm hard a-starboard, and crossing the bows of the bark to the eastward. It was, in any view, a dangerous maneuver on the part of the pilot-boat. Her witnesses estimated the distance of the bark at that time to be about one-quarter of a mile; but, from circumstances mentioned below, I have no doubt that the distance was not half so much. They claim that that maneuver was justifiable, on the ground that the bark was luffing, so as to warrant the inference that she was rounding to the westward in order to take on a pilot; and, *second*, that it was necessary for the pilot-boat to take that course, upon the bark's luffing, in order to avoid the collision.

Upon careful consideration of the testimony, I am obliged to find adversely to the pilot-boat in both particulars; namely, that there was nothing done by the bark justly warranting any inference of her rounding to or luffing for the purpose of taking on a pilot; and that there was no necessity for the pilot-boat to starboard for her own safety. When the pilot-boat was seen designing to cross the bark's bows to the westward, and was on the bark's starboard side, it was clearly no fault on the part of the bark to haul two points to the eastward,—that is, to N. N. E.; for by the fourteenth rule of navigation she was bound to keep out of the way of the pilot-boat, which was close-hauled; nor was it any fault that, after the pilot-boat had fully crossed the bark's bows, and bore N. by W., the bark starboarded, and swung back to her proper course, though I think she did this before the pilot-boat had reached three points on her port bow, and was not in fault therefor.

For the pilot-boat it is claimed that the bark swung much to the westward of her true course; namely, to N. W. by W. This contention rests on the evidence of Johnson, the wheelsman of the bark, called in behalf of the pilot-boat; and also upon the testimony of one of the pilots, that the masts of the bark were seen nearly in line. But Johnson's testimony is not only subject to suspicion, in consequence of his former difficulties with the master; but his statements, taken together, are wholly incompatible with the other testimony on both sides, and are so plainly mistaken that no weight can be given to them. He states explicitly and repeatedly that, the bark's previous course being first north, the first order he received was not to port his wheel, but to starboard his wheel; that he did starboard accordingly, and the bark came up three points, *i. e.*, to N. W. by N., so as to have the pilot-boat *on his lee bow;* that is, his starboard bow. This is his testimony as it stands. Its impossibility discredits his whole testimony. If the change of three points to the west-

ward was after she had already gone eastward two points, namely, to N. N. E., then this change of three points by a starboard wheel would reach to N. by W., a half point only in excess of what the captain swears to observing by the cabin compass, and that difference would be immaterial.

The testimony of one of the pilots, that the masts were seen nearly in line, is subject to the doubt at what precise time they were so seen. That they were observed to be nearly in range at the time when the pilot-boat's wheel was put to starboard did not first appear in the witness' own statement. That statement associates it with his boat's heading about east, i. e., very nearly at the moment of collision. It was only under the strenuous pressure of leading questions by his own counsel that different testimony was given by him. Comparatively small weight, in any case, is due to testimony as to critical facts thus elicited.

That the bark's masts should be seen in line from the pilot-boat at the time the latter starboarded, the bark must have been heading N. W. by N., or three points west of her proper course, if her bearing from the pilot-boat was S. E. by S. That she was at no time heading in that direction, or nearly so, is abundantly proved from all the testimony in the case. The rule so often applied to testimony in regard to the apparent movements of vessels in the water is clearly applicable here, namely, that a vessel's own witnesses as to her movements must be credited, rather than the testimony as to her apparent changes, given by those on board of another moving vessel, unless the testimony of the former is in some way discredited, inconsistent, or improbable. In the present case the testimony on the part of the bark, that she made no changes beyond two points to the eastward and back again to N. ½ W., is established by a number of witnesses who are in no way discredited; while Johnson's testimony, the only witness from the bark opposed, that she went to N. W. by W., so as to have the pilot-boat on her starboard bow, is not only inconsistent with everything else in the case, but would be irreconcilable with the facts of the collision, and with any claim on the part of the pilot-boat; since, if the bark swung to that heading, the pilot-boat, by reason of her far more rapid handling in turning, must have crossed the bark's bows much before the latter could have reached her.

This conclusion is further confirmed by a projection of the courses of the two vessels backwards from the point of collision. The testimony shows that the bark, under a hard a-starboard or hard a-port wheel, would have changed less than a point in going a length, not more than a point in going 200 feet. Witnesses on both sides state that the pilot-boat, which was but 79 feet long, would change as much as seven points in going from 300 to 400 feet, or at least a point in going 60 feet,—a little less than a length. Considering that the bark was deeply loaded, drawing 22 feet of water, and that the pilot-boat was light and quickly handled, there is no doubt, both from the testimony in the case, as well as from common knowledge, that this difference in the rapidity of their handling is by no means exaggerated, and that the difference is probably greater, rather than less, than that above stated. At the rate above

given, the course of the pilot-boat, under a hard a-starboard wheel, would be represented by a curve of 300 feet radius; that of the bark, by a radius of from 1,000 to 1,100 feet. Assuming that the pilot-boat, with the wind one point free, was going only four knots, the most favorable to her that the evidence will admit, she must have starboarded one minute only before the collision, during which she changed her heading from S. E. by S. to N. by E., her heading .at the time of the collision. The bark, which was then heading N. N. E., could not have changed two points from N. without going at least 400 feet; and she must therefore have ported about the time, or a little before, the pilot-boat starboarded. This accords with the statement made by the pilot Noble, who says that, when he ported, the pilot-boat did not seem to be drawing across his bows, but to bear about the same as before. A very little consideration of the necessary limits of the courses of the two vessels will show that the testimony of the two pilots on the pilot-boat, in their estimates of time and distance and relative situations, are wholly incompatible and irreconcilable with the most essential facts. The testimony indicates, without any substantial variation, that the vessels, at the time of the collision, headed as above stated,—the pilot-boat about N. by E.; the bark about N. N. E. Had the bark been headed N. W. by N., or nearly so, at the time the pilot-boat starboarded, or just before, the pilot-boat, under her rapid change of heading, must have crossed the bark's course much before the bark could have reached her under her slower change, nor could the bark in one minute, or in double that time, have changed five points to N. N. E.

The conclusion is inevitable, both from these latter considerations, as well as from the ordinary rule as to the credit to be given to testimony by persons on board vessels in motion that there was no such rounding of the bark to the westward as the pilot-boat supposed; and that her masts were not in line, nor nearly so, until the pilot-boat had brought them nearly in line by her own changes, under her starboard helm. I very much doubt whether any change in the line of the masts was visible while the bark was first going back to her proper course from N. N. E.; but, if it could be and was observed, it was no such change as warranted the inference drawn from it; for the bark was still nearly 12 points off the wind. Doubtless the pilot did suppose that the bark was intending to round to in order to receive him on board; but it was, I think, an altogether hasty and unwarranted judgment, founded only upon the position of the bark's sails and yards; an error into which pilots of riper years would not have fallen.

The same consideration of the necessary courses of the vessels under a hard a-port or a hard a-starboard helm shows, also, that, even if the bark had been luffing as supposed, the pilot-boat was under no necessity of starboarding her helm merely to avoid the bark. She would have avoided her by a larger and safer margin by porting than by starboarding, as she was. already to the westward of her, and would swing to the westward under a port helm much faster than the bark under a starboard helm.

It is urged that the proved slipping of the ropes on the axle of the wheel might have prevented, and probably did prevent, the swinging of the bark to the westward from being checked as soon as intended. If any large swing to westward had been proved, no doubt the cause suggested was adequate. But there is too much uncertainty as to the time when the slipping of the ropes took place to allow it much force. The weight of testimony does not indicate that it occurred at that time, but afterwards. It is wholly insufficient, in my judgment, to outweigh the considerations above referred to.

The only remaining question is whether the bark is in fault for porting just before the collision. In my judgment this was no fault, and for several reasons:

*First.* Because it was for the purpose of keeping away from the pilot-boat; the helm having been ported, certainly not after the pilot-boat starboarded, but probably a little before and when there was no indication that the pilot-boat was intending to cross the bark's bow again; and when the pilot-boat's light was apparently drawing undesirably near, though on about the same bearing, the bark rightly desired to keep further away. I have no question that at that time the pilot-boat was at least three points on the bark's port bow. Nothing could have been more unexpected to the bark than that the pilot-boat should starboard, and again attempt to cross her bows. The bark had done nothing to make such a maneuver by the pilot-boat seem possible. The pilot certainly could not foresee it, and was not required to entertain such an idea. *The W. C. Redfield,* 4 Ben. 227, 234.

*Second.* The rules applicable to a vessel and a pilot-boat, after assenting signals have been exchanged between them, when the movements of each are designed for the purpose of taking a pilot on board, are wholly inapplicable to this case. The bark had given no assenting signal, and no warrant to the pilot-boat to suppose that a pilot was wanted. The failure to see any assenting signal on the bark was of itself notice to the pilot-boat that no pilot was desired. Under such circumstances, both vessels were bound by the ordinary sailing rules; and, as both were running free, the bark was the one bound to keep out of the way, because she had the wind on her port side as well as aft. New Rules, art. 14, (c.) (e.) The bark, therefore, was not in fault for maneuvering to keep out of the way.

The bark was, doubtless, bound to avoid anything which she could reasonably suppose would mislead the pilot-boat to her injury. In holding that the bark did not go more than half a point to the W. of N., it is impossible to find anything on the part of the bark which can justly be said to have wrongfully misled the pilot-boat. The mistake of the latter was by her own fault, and founded, as I believe, entirely upon the position of the bark's sails and yards, which was a wholly insufficient ground for the inference drawn from it. In my opinion, no such inference was justifiable in the night-time until the bark had gone several points to the west; much less had the pilot-boat any right to adopt so dangerous a maneuver until the bark showed both colored lights; neither

of which was done. Even when both colored lights would first come into view the bark would still be nine points off the wind; and, considering the case with which the pilot-boat is handled, there would be no difficulty after that in her keeping away. She was bound to avoid the dangerous maneuver of crossing the bark's bows when she was so near, until the bark's supposed intention should be made reasonably certain by showing both her colored lights. Had the pilot-boat observed this caution, no collision would have occurred. When she starboarded, the bark, as I find, was not within two or three points of her supposed position. She wanted no other pilot; she neither signaled nor rounded to. The collision having been caused by the mistake and unwarranted inference of the pilot-boat, and without any legal fault of the bark, the loss must be borne by the pilot-boat alone. Decrees must be entered accordingly; but, under the circumstances, without costs.