## THE FARNLEY.[*]

### (*Circuit Court, D. Maryland.* June 16, 1881.)

1. COLLISION BETWEEN STEAMER AND SAILING VESSEL.

   The sailing vessel claimed that she altered her course *in extremis*, and to ease the blow. *Held*, upon the facts as found by the court, that the sailing vessel unjustifiably altered her course, and contributed to bring about the collision; that if she altered her course at all she should have so acted as to aid the steamer in avoiding the collision. *Held*, that the steamer was also in fault, when she had plenty of sea-room, in passing the sailing vessel in the night-time so close as to allow a collision to result from a miscalculation of those in charge of the sailing vessel. *Held*, that the damages must be equally divided.

Appeal in Admiralty.

[*]See 1 FED. REP. 631.

·FACTS FOUND BY THE COURT.

(1) A collision occured in the Chesapeake bay about 7:30 in the evening of the eighth of September, 1879, between the American schooner A. R. Weeks, in charge of an American master, bound from Baltimore to Boston, and the British steamer Farnly, in charge of a licensed bay pilot, on her way, in a partially disabled condition, to Baltimore for repairs. The sun set that evening at about 6:20, and the moon was just approaching its last quarter. The night was clear. The wind was north-westerly, and blowing about a seven-knot breeze.

(2) From the place of collision Sharp's island light bore about S. E., and was from three to four miles distant.

(3) According to the sailing directions given on the official coast charts, vessels going up the bay take a N. by W. ¾ W. course until they reach a point from which Sharp's island light bears E., four and one-quarter miles distant, thence N. ¼ E. a little less than ten miles, and thence N. by E. ¾ E. Going down, of course, they take the opposite direction. The collision occurred, as near as can be ascertained, from two to three miles above the point for change of course from N. by W. ¾ W. to N. ¼ E.

(4) The schooner was making about seven miles an hour, and was able to take any course she chose.

(5) The steamer was going up against the wind, using only one boiler, as the other was disabled. She was making only about four miles an hour, but was under complete control. She had left Baltimore the morning before, bound for Antwerp, Belgium, with a cargo of 93,000 bushels of grain, but on her arrival near the Wolf Trap light it was discovered that her port boiler was in such a leaky condition as to make it unsafe to go to sea without repairs. At 6:30 in the morning of the 8th she put back to Baltimore, using only the starboard boiler. She had been all day getting from about three miles above Wolf Trap to the place where the collision occurred.

(6) The schooner had on deck from 6 o'clock until the time of the collision her master, who had commanded her most of the time since she was built, in 1873, and who had been a master mariner for about 12 years; her second mate, an able seaman, and an inexperienced boy. The master was in command, and the seaman standing at the bow as lookout and performing that duty. The boy took the wheel when the watch began, but the second mate was steering when the collision occurred. At what precise time he relieved the boy is not satisfactorily shown. The boy was manifestly incompetent to perform such a service, and so known to be. When the second mate took the wheel the boy was sent to shovel over ballast. All the regulation lights were properly set on the schooner and burning.

(7) The steamer had the pilot on the bridge, the mate on the skeleton bridge, a lookout at the bow standing on the forecastle, a quartermaster at the wheel, and a sufficient number of men on deck standing their watch. The bridge is from six to eight feet above the deck, and the skeleton bridge about the same distance above that. The steamer was 280 feet long.

(8) The vessels were seen from each other a considerable time before the collision, and when they were from one to two miles apart, at least. When first

seen they were sailing substantially in opposite directions. They continued to approach each other end on, or nearly end on, so as to involve risk of collision, until they were not more than three or four hundred yards apart, when the steamer put her wheel to port so that each might pass on the port side of the other. Almost immediately after this was done her wheel was put hard a-port, and she fell off her original course six or seven points to the eastward before the collision. Shortly after the steamer began going off under her port wheel, and without any sufficient cause or excuse for so doing the schooner put her wheel to starboard, under the effect of which she also fell off to the eastward. If her wheel had been ported instead of starboarded the vessels would not have come together.

(9) In the collision the schooner struck the steamer on the port side, near the end of the bridge, and but little forward of midships. The cutwater of the schooner was bent over by the blow from starboard to port, and her starboard bow to a distance 10 feet back from the stem was broken. Her port bow was not injured except at the stem. She filled and sank in less than an hour.

### CONCLUSIONS OF LAW.

(1) That the steamer was in fault for attempting to pass too close to the schooner, and not taking sufficient precautions in time to get by in safety.

(2) That the schooner was in fault for unnecessarily and inexcusably starboarding her helm, and thus bringing on the collision.

(3) That the damages to the two vessels should be equally divided between them.

(4) That the master of the schooner is entitled to recover against the steamer only one-half his loss.

(5) That the owner of the cargo of the schooner is entitled to a decree against the steamer for the full amount of its loss.

(6) That on payment of the steamer of the decree in favor of the owner of the cargo, the steamer will be entitled to credit for one-half the amount so paid on any decree which may be rendered against her in favor of the schooner. WAITE, Chief Justice.

*Robert H. Smith* and *Sebastian Brown,* for libellants.

*Thomas & Thomas,* for respondents.

WAITE, Chief Justice. It would be a useless task to attempt to reconcile the conflicting evidence in this case. There are, however, some conceded facts. The steamer was going up and the schooner down the bay. The wind was north-west, or perhaps a little north of that. The libel alleges it was north-west, and the master and second mate of the schooner say the same. The pilot of the steamer says it varied from N. N. W. to N. W. Both vessels were in a condition to avail themselves of the most desirable courses up and down the bay. They were where, according to the official chart, that course would be N. ¼ E. or S. ¼ W., and about four miles to the west of Sharp's island light. The schooner had her sails off to port. That is

where they would be if she was sailing on the course given by the chart. The wind was about a seven-knot breeze. The schooner was going at the rate of about seven miles an hour and the steamer four.

Each vessel saw the other a considerable time before the collision, and when they were certainly more than a mile apart. The regulation lights were properly set and burning on both vessels. Before the collision the steamer put her wheel to port, and soon after hard a-port. Under the operation of this helm she fell off to the eastward several points. Not long after the steamer began to fall off, the schooner put her wheel hard a-starboard, which carried her also off to the eastward. In the collision the schooner struck the steamer, which was 280 feet long, about midships. The cutwater of the schooner was bent by the blow from starboard to port, and her starboard bow, to a point 10 feet back from the stem, was so much broken that she filled and sank in less than an hour. The port bow of the schooner was not injured at all, except, perhaps, directly at the stern.

So far there is no dispute. The issue between the parties may be thus stated: The schooner claims to have been sailing for a half hour before the collision on a course S. by E. ½ E. Before that time her course had been S. by W. ½ W. About a quarter of an hour before the collision the lookout of the schooner saw and reported the mast-head light of the steamer bearing about one point over the starboard bow. Not long afterwards the green light of the steamer appeared in the same direction. These lights continued in sight without any material change of bearing until the vessels got within three or four hundred yards of each other, when suddenly the steamer went off to the eastward, exhibited her red light, and started directly across the bow of the schooner. No change was at first made in the course of the schooner on this account, but when the bow of the steamer came opposite that of the schooner, the wheel of the schooner was put hard a-starboard, and she too fell off somewhat to the eastward before the vessels came together. The change of course by the schooner, it is claimed, was because the steamer had, by her unskilful movements, made a collision inevitable, and such a change was necessary in order to avoid more disastrous consequences.

On the part of the steamer it is claimed that she was going up the bay on a course N. ½ W., when her pilot on the bridge and looking through a glass saw the sails of the schooner almost directly ahead and some miles away. Not long afterwards the red light of the schooner appeared, bearing somewhat less than a point over the port

bow. This light, as the vessels approached each other, drew slightly to port. The pilot, after awhile, thinking it prudent to widen somewhat the distance between the courses of the two vessels and to show his red light decidedly to the schooner, ported her wheel. Almost immediately afterwards the schooner seemed to be falling off in the same direction. At first both her green and red lights were displayed to the steamer, and then her green alone. As soon as the change in the course of the schooner was made, the wheel of the steamer was put hard a-port, but the engines were not stopped.

The difficulty is in relation to these claims. The testimony on both sides is positive. It was undoubtedly the duty of the steamer to keep out of the way of the schooner, but it was equally the duty of the schooner not to embarrass her in her efforts to that end by an unnecessary change of course. When two sailing-vessels or two steam-vessels are meeting end on, or nearly end on, so as to involve risk of collision, the statutory sailing rules require both to put their helms to port, so that each may pass on the port side of the other. Rev. St. § 4233, rules 16, 19. The supreme court has said that ships would be meeting end on, within the meaning of this rule, when they were approaching each other from opposite directions, or on such parallel lines as to involve risk of collision on account of their proximity. *The Nichols,* 7 Wall. 664; *The Dexter,* 23 Wall. 69. I am satisfied from the evidence that, under this rule, these vessels were approaching each other nearly end on. This may be fairly inferred from what is said by the witnesses on both sides, when taken in connection with the admitted facts. It is not pretended by those on the schooner that the steamer was seen at any time more than one point over their starboard bow, and she kept that position without any change at all until the vessels were within three or four hundred yards of each other, and probably less, according to the statements of the witnesses. In that time the vessels together ran more than a mile. So, on the steamer, the schooner, when miles away, according to the statements of the pilots and others, appeared to be almost directly ahead. When her red light was first seen it bore less than a point over the port bow, and it at no time opened much, if any, more than a point in that direction. According to the testimony from the schooner, the first indication of any change of course in the steamer was when the red light appeared, and it was but a very short time after that before the bow of the steamer came across that of the schooner. Then the schooner starboarded her wheel, and the steamer had only time to get far enough by to receive the blow midships or thereabouts. The tes-

timony from the steamer is that, although her wheel was put hard a-port, and she kept on at her full speed of four miles an hour, the schooner, by starboarding, was able to overtake and collide with her before she could get out of the way. All this indicates most unmistakably to my mind that, whether the steamer was in fact a little to the east or a little to the west of the schooner, the lines of the courses of the two vesssels were from the beginning in dangerous proximity. This conclusion is strengthened by the further fact that the collision occurred not very far from the place where the vessels would be likely to be if they had followed closely the sailing directions given upon the chart, which both vessels were perfectly able to do. The steamer, loaded and disabled as she was, would be almost certain to take the most desirable route, which could not but have been known to her pilot of more than 34 years' experience, and no reason is given why the schooner should not have done likewise.

The statutory rules do not require a steamer, when meeting a sailing vessel end on, or nearly end on, so as to involve the risk of collision, to port her wheel and let the vessels pass port to port, but, other things being equal, that would be the natural impulse of every navigator. Custom has made that the almost universal rule of the road both on land and water in this country. Approaching as the vessels were, the schooner ought to have looked for a change of course on the part of the steamer and to have been prepared to act in a way not to interfere with what she did. While the steamer might not decide to pass port to port, it was certainly most probable that she would. The wind was on her port bow and would help her in going off to the eastward, while it would be a serious obstacle to her getting to the westward or port. Under these circumstances, to wait any appreciable length of time after the red light appeared and then steer so as to counteract the known and, as it seems to me, under the circumstances, proper movement of the steamer, was, to my mind, a clear fault. I cannot but believe that if instead of starboarding the master of the schooner had ported his helm there would have been no collision, and I am by no means certain there would have been any if he had kept his course.

It is claimed, however, that the helm was not starboarded until after the steamer had, by unskilful navigation, made the collision inevitable, and that it was done to ease the blow. This I cannot believe to be true. I have been unable to put implicit confidence in the unsupported statements of the principal witnesses on either side. The testimony of the master of the schooner and the pilot of the

steamer is full of inconsistencies, and in many particulars contradicted by the admitted facts. It is conceded on the part of the schooner that up to within a half hour before the collision she had been sailing S. by W. ½ W. That varied only one-quarter of a point from the course indicated on the chart until the place was reached where a change should be made to S. ¼ W. If at that place the vessel had been put on a S. by E. ½ E. course it would have taken her over the· shoals at the south end of Sharp's island. Had she kept on S. by W. ½ W. until she could clear these shoals on a S. by E. ½ E. course, she would have been taken far to the westward of the line the steamer would naturally be on in going up. In approaching the steamer, under such circumstances, she would see the red light of the steamer over her starboard bow and not the green, unless the steamer should be going N. by W. ½ W., or nearly so; a thing not at all likely, as her true course would be so as to make N. ¼ E. As the collision, probably, occurred somewhat to the eastward of the course indicated on the chart, and which was drawn N. ¼ E. from a point 4¼ miles west of Sharp's island light, and the steamer went off but little from the course she was originally on, it seems to me clear that if the schooner had been for half an hour on a S. by E. course, she could not have seen the green light of the steamer. Under such circumstances the green light of the schooner would have been, probably, presented to the steamer, but the red of the steamer would have been presented to the schooner. It is also a noticeable fact that although it is said those on the schooner at first saw the green light of the steamer alone, and then the red, no one saw both the red and green together, although they must have been shown at some time if the steamer so materially changed her course, as is alleged, when near by. Under all the circumstances I do not think the schooner has excused herself from the fault of starboarding her wheel. The steamer, moving as she was slowly through the water, must have occupied considerable time in bringing herself from her course up the bay to one almost directly across. When she was going up she was heading lengthwise of the bay, and if the schooner had herself ported as soon as she saw the red light, it seems to me clear that a less variation from her course would have been necessary to get her by, than was afterwards required to ease the blow by falling off to starboard.

Another circumstance is equally significant: If the wind was N. W., as it probably was, and the schooner going S. by E. ½ E., the wind was within two and a half points of being directly over her

stern. Any considerable change to the east under her starboard helm must necessarily cause her to jibe. This, the pilot of the steamer says, actually did occur. In jibing she would certainly be more unmanageable, and require more attention from the officers and crew, than she would if she had ported and attempted to come further up into the wind. Besides this, it is conceded she had on deck at the time, standing his watch, an incompetent boy. For some time after 6 o'clock he had been steering. When he left the wheel is by no means satisfactorily shown. The second mate says he himself took the wheel at five minutes past 6, and set the boy to shovelling ballast. The boy leaves the impression from his testimony at first that he was not at the wheel at all, but afterwards he said distinctly he had been steering until about half an hour before the collision, when the second mate relieved him, and told him to shovel over the ballast. He also said if he had not been working at the ballast he should have been steering. From all the evidence, it is clear that, notwithstanding his incompetency, he was accustomed to take his trick at the wheel, and I am by no means satisfied that he had not been at the wheel up to the time the vessels got into dangerous proximity.

Without pursuing this branch of the case further, it is sufficient to say I am satisfied, from all the evidence, that the starboarding of the helm of the schooner contributed directly to the collision, and that it was a fault. It was a wrong move, and no sufficient reason is given for making it. Neither do I think the schooner can be excused on the ground that it was done in the excitement of the moment, and when there was no time for the exercise of deliberate judgment. The master saw the steamer going off suddenly to port. He waited an appreciable length of time after he saw the red light before doing anything, and then deliberately did what was exactly wrong. The most ordinary prudence would have dictated to him, as soon as he saw the red light coming diagonally across his bow, as it must have done according to his own showing, if he altered his course at all, to port his wheel and help the steamer in what she was doing. Any other alteration in his course at that time was a fault, and entirely inexcusable.

It only remains to consider whether the steamer was also in fault, and I am clearly of the opinion she was. Upon her rested the responsibility, under the statute, of keeping out of the way of the schooner. As has already been seen, the vessels were approaching each other end on, or nearly end on, so as to involve the risk of collision. This condition of things continued until the order to port the helm of the

steamer was given, which, according to the allegations of the answer, was only a few seconds before the order "Hard a-port."

The averments of the answer in this particular are supported both by the mate and the wheelsman. The pilot swears differently, but the conceded facts and corroborating circumstances are all against him. I am satisfied the answer states the truth. The collision, all agree, occurred a very short time after the order "Hard a-port." At most, according to all the evidence, the vessels did not sail more than three or four hundred yards, which, at the combined speed they were going, could be traversed in but little if any more than a minute. That haste was required on the part of the steamer to get out of way is apparent from the fact that the order "Hard a-port" followed sharply on that to port. Under these circumstances it seems clear to me that the steamer held her course too long without making calculations to get by. It is undoubtedly true that if the schooner had ported her helm, instead of starboarding, the collision would have been avoided; but that, in my opinion, does not excuse the steamer from her original fault in getting so close as to make it possible to bring the vessels together in such a way. When there is plenty of sea-room, and nothing to prevent, it is wrong for a steamer, in passing a sailing vessel at night, to go so near as to permit a collision in consequence of a mistake of this character on the part of the schooner. It is her duty to give a passing vessel a wide berth when it can be done, and to run no risk of errors or miscalculations.

As both vessels were in fault the damages to the vessels must be equally divided between the two. As the master of the schooner himself, by his personal conduct, contributed to the loss, his recovery against the steamer must be confined to one-half his damages. The owner of the cargo is entitled to a decree against the steamer for the full amount of its damages, but, upon payment of the amount found due, the steamer will be entitled to credit on any decree that may be rendered against her and in favor of the schooner for one-half the sum so paid.

An order may be entered referring the cause to a commissioner to ascertain and report the amount of damages sustained by the parties respectively.