THE DORIAN.

MONTVET et al. v. THE DORIAN.

(District Court, S. D. New York.    March 28, 1895.)

COLLISION—STEAM AND SAIL—OPPOSITE COURSES—CONTRADICTION AS TO LIGHTS
—NEITHER STORY CREDIBLE—INATTENTION—BAD LOOKOUT—CHANGE OF
COURSE—CLOSE SHAVING.
    The schooner S. going west, and the steamer D. going east, in a clear
night came in collision in Long Island Sound, N. W. from Eaton's Point
light.   Their proper courses were opposite, and the S. had a fair wind.   Each
charged the other with sheering to the south just before collision, when on
courses to clear by 500 to 1,000 feet.   The testimony as to the lights seen,
and those exhibited to the other, was irreconcilable.   The D. claimed that
she turned to the south sufficiently to avoid collision when at a reasonable
distance from the S.   The master of the S. made a certain mistake in one
particular as to his change of course, upon which fabrication of testimony
was charged.   Upon an analysis of the evidence as to the navigation, *held*:
(1) That for some minutes before collision the vessels' courses were within
one-half point of opposite, and nearly head and head; (2) that no attention
was given to the schooner by the D. until less than a minute before col-
lision, when she changed 1½ points more to the southward; (3) that the
master of the schooner incorrectly located the S. on his starboard bow,
from viewing her from the starboard side of his own vessel, and changed
his course to the south at about the same time the D. changed; (4) that
the S. was in fault for the latter change, and the D. in fault for inattention
and bad lookout, and for not taking timely measures to avoid the S. by a
reasonable margin; and the damages were divided.

    This was a libel by John C. Montvet and others, owners of the
schooner Clara E. Simpson, against the steamship Dorian, to re-
cover damages resulting from a collision.

Carver & Blodgett and J. Langdon Ward, for libelants.
Wing, Putnam & Burlingham, for claimant.

BROWN, District Judge.    At about 11 o'clock on the night of
December 4, 1894, the libelants' schooner Clara E. Simpson, bound
west through Long Island Sound, was sunk with all on board, in a

collision with the steamship Dorian, bound east. The collision occurred at a point about 2½ miles N. by W. from Eaton's Point light. The stem of the steamer struck the schooner's starboard side near the mizzen rigging, at an angle of from two to four points. The master and two others were rescued; the rest of the crew were drowned. The above libel was filed to recover damages for the loss of schooner, cargo, and personal effects.

Each vessel charges that the collision was caused by the fault of the other, through a sheer made to the southward shortly before collision. Each admits that a change of course was made to the southward; but each avers that her own change was so long prior to the collision as to be in no degree the cause of it.

The steamer's witnesses say that the schooner's red light was seen about two miles distant, a half point on their starboard bow; that the steamer's heading was then at once changed from E. ½ N., to E. by S. ¼ S., so as to bring the schooner's red light one point on the steamer's port bow; that the schooner at no time showed her green light, but only her red light, until a few moments before collision, when being only about 700 feet distant and two or three points on the steamer's port bow, she suddenly showed both lights and ran under the steamer's stem. The master of the schooner, on the contrary, who was in charge of her navigation, says, that at no time did the schooner show her red light to the steamer, but only her green light; that when the steamer was two or three miles distant, upon being reported by the lookout, he went to the forecastle head, and with his glasses made out both colored lights of the steamer a little on his starboard bow; that he remained there until the steamer shut in her red light, and showed her green light only, about a mile distant and considerably upon his starboard bow; that he then went aft, and that the steamer, when her green light bore about two or three points on his starboard bow, and being 400 or 500 yards distant, as he estimated, suddenly turned to the southward, showed both lights, and ran down upon him, as before stated.

Not only are these statements utterly irreconcilable, but each ascribes to the other an extremely improbable course of navigation. Each practically alleges that when all danger of collision was past, and the vessels were heading away from each other so as to pass at a distance of from 500 to 1,000 feet apart, the other, without the least reason, turned to the southward and ra    ito collision.

An undoubted error in the statement of the master of the schooner as to the time and place when he put his vessel on a west course is pointed out by the respondent's counsel. Early in the evening the schooner had come to anchor about three miles eastward of Eaton's Point light. At about 10 o'clock p. m., the wind springing up from N. by E., she again got under way, closehauled on the starboard tack. Soon afterwards the captain gave the wheel to the wheelman, and she was put upon a course N. W. by W., one point free, and making about 4½ knots per hour. The captain says that the change to west was afterwards made when Eaton's Point light bore S. W. by W., which would be at a point three miles east of the place of collision, a point which was nearly dead to windward of the

place where the schooner was anchored, and which it was impossible she could reach on her starboard tack.

The respondent argues from this error, and from some other minor considerations, that the story of the master, supported to some extent by the wheelman, is a fabrication, designed to conceal a change of course from N. W. by W. to W. just before collision, which the respondent urges was the change alleged by the steamer, and a change made heedlessly without previous observation of the steamer's near presence. The master's evident mistake, and the other circumstances cited, seem to me insufficient to support this charge. The severe experience of the master in the collision might naturally cause some confusion in his recollection on a matter of such secondary importance as the bearing of Eaton's Point light when he changed his course; and the correction in the stenographer's notes as to this bearing indicates some apparent uncertainty in his recollection. The bearing was probably about S. by W., instead of S. W. by W. The general narrative of the master is in itself reasonable and probable. It accords to a considerable extent with the undoubted movements of the steamer; although her bearing of two or three points on his starboard bow, when her two colored lights were shown the second time, cannot be taken as correct, unless the schooner changed a second time to the southward, shortly before collision, which, from all the circumstances, and the conversation between the master and wheelman after the collision, I think she did.

The story of the steamer, however, is quite as unsatisfactory as that of the schooner. It is not consistent with the theory that the schooner's red light was seen while the latter was on a course of N. W. by W. For the steamer's evidence leaves no doubt that the change of which she complains was only about 30 or 40 seconds before the collision. This appears from three circumstances: (1) The testimony that the vessels were then only about 700 feet apart: (2) The mate, who was in charge of the steamer, says that as soon as the schooner's two lights were seen, he ordered the engines reversed; the engineer says they were reversed full speed within 10 seconds, and that there were but 12 or 15 revolutions backward before collision, full speed being 60 revolutions: (3) The wheelman put the wheel hard a-starboard as soon as the lights were seen, and only just got it hard over as the collision occurred. Had the schooner been previously going N. W. by W., she must have changed three points to show her two lights to the steamer, and three or four points more before collision; and with the steamer, heading E. by S. ¼ S., and the schooner two or three points on her port bow, the schooner could not, from that position, have got across the steamer's bow within 30 or 40 seconds or reached the place of collision; and it is, moreover, so improbable as to be inconceivable, that with the bright lights of the steamer within 200 or 300 yards, the schooner should have turned six points towards the steamer and run under her stem, even if it was possible to reach her.

But even this, if true, would not have excused the steamer from blame. For by her own further testimony it appears that from the

time when the schooner's red light was first seen, viz., about a half point on the steamer's starboard bow, until the two lights were seen, about 30 seconds before collision, there was only time to turn the steamer's head a point and three-quarters more to the southward, viz., to E. by S. $\frac{1}{4}$ S. (which of itself would bring the schooner's light $1\frac{1}{4}$ points on the port bow), and to go ahead enough to broaden the light off about one point more; that is, from 300 to 700 feet, occupying from 20 to 45 seconds, according as the schooner was heading W. or N. W. by W.; so that the schooner could not have been seen by the steamer, according to the latter's testimony of what occurred, nor any efforts made by the latter to avoid the schooner, until from 45 to 90 seconds before collision. This was a gross fault in the steamer, which was bound to keep away from the schooner by a good margin, and by seasonable maneuvers. That the interval was short between the time when the schooner was first seen and the appearance of her two lights, is confirmed by the explicit statement of Martin, the mate, who on cross-examination says, "It was a very short time"; and though he calls it "three or four minutes, likely," what was done, viz. to broaden off only a point, shows the interval to be about one-half or three-quarters of a minute only.

From the circumstances of the collision, and the probabilities of the case, I am quite satisfied that the collision did not take place in the manner indicated by the witnesses on either side, but that the vessels for several minutes previous to the collision were approaching very nearly head and head, not varying more than half a point from directly opposite; that the master of the schooner placed the steamer more upon his starboard bow than she really was, from the fact that he viewed her from the starboard side. This is confirmed by the fact that the wheelman did not see the steamer's lights until very shortly before collision. I am persuaded that the steamer paid no attention to the schooner, and took no steps to avoid her until very near her, and after the steamer had shut in her red light and showed only her green light to the schooner, which appeared to the master to be somewhat on his starboard side, though I doubt if at that time it really was so; that the steamer within a minute and a half of collision, or less, and when both the schooner's lights were probably visible, ported her wheel to go to the southward of the schooner; and that the schooner about the same time starboarded her wheel to go to the southward, either because it seemed safe to do so while the steamer's green light only was visible, or because after seeing both lights through the steamer's swing, starboarding seemed the safer course. This swing to the southward by the schooner would account for the bearing of the steamer's two lights two or three points or more on the schooner's starboard bow, as testified to by the captain and the wheelman, when the latter first saw them. The schooner is, therefore, to blame for making a wrong change of course; and the steamer for neglecting to take timely measures to avoid the schooner by a safe margin so as to avoid creating the alarm to which the steamer's change of course must be ascribed.

The case is very closely similar in all important respects to that of The Farnley, 8 Fed. 629, in which the late Chief Justice Waite,

sitting on appeal in the Fourth circuit, held both the steamer and the sailing vessel in fault for almost exactly similar errors. In this case, as in that, the duty and responsibility of keeping out of the way of the schooner rested upon the steamer, and there was nothing to prevent her doing so seasonably. They were approaching nearly end on, and in this case, as in that, the steamer took no means to avoid the schooner until about 400 yards from her.

"Under these circumstances," says Chief Justice Waite (page 637), "it seems clear to me that the steamer held her course too long without making calculations to get by. It is undoubtedly true that if the schooner had ported her helm, instead of starboarding, the collision would have been avoided; but that, in my opinion, does not excuse the steamer from her original fault in getting so close as to make it possible to bring the vessels together in such a way. When there is plenty of sea room, and nothing to prevent, it is wrong for a steamer, in passing a sailing vessel at night, to go so near as to permit a collision in consequence of a mistake of this character on the part of the schooner. It is her duty to give a passing vessel a wide berth when it can be done, and to run no risk of errors or miscalculations."

Decree for libelants for one-half the damages, and the costs to be divided.