## THE PATRIA (two cases).

### (District Court, S. D. New York. February 18, 1899.)

COLLISION—STEAM AND SAIL—FOG—INSUFFICIENT LOOKOUT—EXCESSIVE SPEED —FOG HORN NOT HEARD—PRIVILEGED VESSEL TO GIVE WAY—MANEU-VERING POWER.

Upon a collision at sea in thick fog about 20 miles off Fire Island between the steamer P., going at "half speed," and a four-masted schooner, closehauled, going at a speed of about 3 knots, it being found upon the testimony, as well as upon the maneuvering power of the steamer, that her speed was about 7 knots, or about two-thirds of her full speed, *held* excessive, when the schooner could be seen only 600 or 700 feet distant, and not justified by her failure to hear the schooner's horn earlier; and that a lookout on the bridge, without any at the bow, was insufficient. It further appearing that the steamer was approaching upon the schooner's lee beam, and that the master of the schooner had notice of the imminence of collision and that the steamer was backing, about two minutes before collision, *held*, that it was his duty to luff, as he might have done in order to aid in avoiding collision; since this was clearly a safe maneuver and could not possibly do harm, and was one of the "ordinary practices of seamen" within articles 21, note, 27 and 29, and that the damages should therefore be divided.

Carver & Blodgett, for the Francis M.
Cowen, Wing, Putnam & Burlingham, for cargo owners.
Benedict & Benedict, for the Patria.

BROWN, District Judge. The above libels were brought to recover for the damages to the four-masted schooner Francis M. and for the loss of her cargo, through collision with the steamship Patria, off Fire Island, about 18 or 20 miles S. by W. from Shinnecock Light, a little before 2 p. m. of September 5, 1898, in thick fog.

The schooner, 205 feet long, two-thirds loaded with a cargo of ice, was bound from Kennebec river to Baltimore, and was going in a light wind from the westward on the starboard tack at the rate of about three knots an hour, heading S. W. by S., but making leeway about 1½ points, as her master states, so that her true path was about S. by W. ½ W.

The steamer, 340 feet long, bound from the Mediterranean to New York with passengers and cargo, was proceeding upon a course due west. Her full speed was about 11¼ knots an hour. At 1:30 p. m. she ran into a low fog, which became thick at 1:45. At that time, according to her testimony, her engines were put at "half speed," and her fog whistle was thereafter sounded regularly at intervals of not over one minute. The schooner's witnesses say that her mechan-

ical fog horn was also sounded properly, and that the steamer's whistles were heard several minutes before collision. But no fog horn from the schooner was heard on the steamer until about the time when the schooner herself began to loom up in the fog, probably from 600 to 700 feet distant; whereupon the steamer's engines were immediately reversed and three blasts of her whistle sounded, to give notice of that fact to the schooner, about two minutes before collision. The steamer, under reversed engines and a port wheel, swung from two to three points to starboard and struck the schooner about midway between the foremast and mainmast, at about right angles, making a hole in her side from two to three feet deep and wide, so that she soon filled and capsized.

The steamer contends that her speed was "moderate" and only about 5½ knots, and that the collision arose (1) from the fact that no fog signals could be heard from the schooner until the latter was very near; and (2) because the schooner when the steamer's backing signals were given did not luff and aid in keeping off. There is much contradiction in the testimony concerning the density of the fog, the distance at which vessels could be seen, and as to the whistles heard.

The fog was low and dense upon the water and lighter above; so that the sky was nearly clear, and the sun visible. The schooner should have been seen somewhat sooner than the steamer, both from her white sails on which the sun was shining, and also because the lookout on the steamer was much higher than the lookout on the schooner. Most of the seamen from the schooner, however, testify, that the steamer was seen a long distance off,—from a third of a mile to a mile; and that several blasts of her whistle were heard before she was seen. If vessels could be seen at any such distance apart, the steamer's speed was sufficiently "moderate" whether her speed was 5½ knots or 7, as I think it was. But the testimony of these seamen is so grossly untrue, that I can give them little credit, even in their testimony about the whistles. The master of the schooner says that after hearing the steamer's whistle he was watching for her, and that he first saw her about 200 yards off, and about two minutes before collision; and this for reasons below stated is doubtless not far from correct. He also says that he heard the steamer's fog signals five or six minutes before collision; but his inability to give any account of what he did to occupy any such interval, in connection with the mate's testimony, leads me to believe that he did not hear the steamer's whistle more than one or two minutes before the steamer was seen. When he heard her first whistle he was on the main deck forward, fixing a fishing reel. The blast he then heard was doubtless the same as the first distinct blast which was heard by the mate, who was in charge on the quarter-deck. The mate was listening, because he had previously thought he heard a whistle which was so faint as to be doubtful and could not be located, and which the wheelsman did not distinguish at all. The next whistle heard, as the mate and wheelsman testify, was but a moment or two before the steamer was seen. I have no doubt that this is the true account as to the whistles heard on the schooner, and that only one

whistle was distinctly heard from the steamer until about the time she was seen, and that this was only about a minute prior to seeing her. The schooner's fog horn would naturally be heard later than the steamer's whistles, both because it was not so powerful as the steam whistle, and also because the blasts of a fog horn, unlike those of a steam whistle, are more specially operative along a particular axis, which much diminishes their penetration outside of the limited arc towards which the horn happens to be directed. If, therefore, the steamer's whistle was not distinctly heard until about one minute before she was seen, the failure to hear any signal from the schooner until about the time she was seen, is explained naturally, without finding any dereliction in the schooner as to the manner or frequency of sounding her horn, or in the attention given by the lookout and officers on the steamer. I pass, therefore, without further comment, those passages in the testimony of the mate, and as to the conversations with the master, from which it is claimed that the horn was sounded irregularly and at longer intervals than one minute. That neither vessel should hear the fog signals of the other until they were near each other, is not uncommon in fogs of variable density. See The Niagara, 77 Fed. 330, affirmed in 28 C. C. A. 528, 84 Fed. 902; The Lepanto, 21 Fed. 656, 657. The liability to surprises in such fogs, makes necessary the use of all available precautions against disaster, as regards speed, lookout and preparations for emergencies on the part of both vessels.

Speed. The engineer states the steamer's revolutions under her reduced speed to have been 29 per minute, equivalent at that time to a speed of about $5\frac{1}{2}$ knots. This does not appear to have been more than the engineer's estimate. It is less than half of full speed; and from the following circumstances I think it too low, and that her speed was not less than 7 knots: (a) There is no doubt that on entering the fog the order given was "half speed," which in all vessels of this class usually gives about two-thirds of full speed; while a reduction to one-half of full speed, requires the order "slow"; (b) in the master's two subsequent experiments with the Patria, made, as he says, under "similar conditions," at "full speed" and at "half speed," the revolutions stated in the memorandum are given respectively as 60 for "full speed" and 36 for "half speed," which with a pitch of 23 feet and a slip of $^1/_7$, gives about $11\frac{3}{4}$ knots for "full speed" and 7 knots for "half speed"; (c) the master says that when he first saw her she was coming fast, and from the rush of water at her stem, as fast as 7 or 8 knots; (d) the engineer says the engine undoubtedly was reversing for a minute and a half before collision; his log shows two minutes; in that time, had her speed been only $5\frac{1}{2}$ knots, she would have been fully stopped at collision; (e) the master's experiments also show that it takes 12 seconds after the orders to stop and reverse are given for the engine to begin backing, and that she stops from "full speed" in 2 minutes 48 seconds thereafter, and from "half speed" (that is, about 7 knots) in 1 minute 58 seconds; from $5\frac{1}{2}$ knots speed she would therefore have been stopped in going about 450 feet (The Normandie, 43 Fed. 162); so that there would have been either no collision, or much less damage.

The comparatively slight wound, however, made in the schooner, and the fact that the paint of the Patria's stem was not scratched, show that the Patria must have been moving but slowly at collision, and that the rate of the approach of the two vessels could not have exceeded 2 or $2\frac{1}{2}$ knots at the moment of impact. Of this rate, $\frac{7}{8}$ of a knot should be ascribed to the sagging of the schooner in making a leeway of $1\frac{1}{2}$ points ($16\frac{7}{8}°$) while moving forward about 3 knots per hour (sin. $16\frac{7}{8}°\times300=87$), leaving probably about $1\frac{1}{2}$ knots as the steamer's headway at collision. A reduction from 7 knots to $1\frac{1}{2}$ upon the above data, allowing 12 seconds for the engine to begin backing, would occupy by computation about two minutes, as the engineer's log states; while the distance traversed by the steamer would be about 100 feet before reversal and 550 afterwards, thus agreeing closely with the master's estimates of time and distance.

From the above considerations, being persuaded that the reduced speed of the steamer was at least seven knots, I am not warranted by the authorities in holding that speed to be such "moderate speed" as is required by the rules of navigation in a fog so thick that a vessel can be seen only a few hundred feet distant. The Colorado, 91 U. S. 692; The Nacoochee, 137 U. S. 330–339, 11 Sup. Ct. 122; The Martello, 34 Fed. 74, affirmed in 153 U. S. 70, 14 Sup. Ct. 723; The Umbria, 166 U. S. 413–418, 17 Sup. Ct. 610; The Bolivia, 1 C. C. A. 221, 49 Fed. 171; The Orizaba, 57 Fed. 247; Donnell v. Towboat Co., 32 C. C. A. 331, 89 Fed. 757.

Besides this, I think the steamer is further to blame for not having a lookout stationed forward at the bow. Nor was the lookout doubled. The Colorado, 91 U. S. 698. There was but one seaman acting as lookout, and he was stationed on the bridge, some 75 feet or more from the bow, and was also attending to blowing the whistle once a minute. The only other person upon the bridge, besides the wheelsman, was the mate, who was in charge of the navigation, the master having gone to his cabin for a change of clothing. If on account of the lighter fog above, it was desirable to have a lookout as high above the deck as possible, a lookout might have been stationed in the crosstrees or crow's nest, as is often done in thick fog; but neither that, nor a lookout on the bridge, would be a justification of the omission to keep a good lookout at the bow, which it has been repeatedly held should be maintained wherever possible. The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860; The Wanata, 95 U. S. 600, 609, 610; The Michigan, 11 C. C. A. 187, 63 Fed. 280. The master states his opinion, that if he had had 10 seconds more time, the collision would have been avoided. Had a lookout been stationed at the bow with no divided duties, and reported the schooner at the same distance it was seen from the bridge, the steamer would have had much more than this additional time for coming to a complete stop and backing away from the schooner.

2. The schooner was, I think, very greatly to blame for doing nothing to avoid the collision; since the circumstances show that without the least risk to herself she might have ported her helm and luffed, and thereby have averted this disaster. No doubt there is great reluctance to find a sailing vessel in fault for keeping her course as respects a

steamer that is bound to keep out of her way. This is the ordinary rule; and as was said by this court in Haight v. Bird, 26 Fed. 541, prior to the recent amendment of article 21:

"No exception to this rule can be allowed, except where it is entirely clear not only that by changing her course she would in fact have avoided the collision, but that under the circumstances of the moment, as they appeared to the sailing vessel, escape by that means was so easy and obvious to a person of ordinary nautical judgment, that it was clear negligence to omit it."

Where this is clear, the authorities are abundant, new and old, to the effect that it is the duty of the privileged vessel to give way. In Peck v. Sanderson, 17 How. 178, 182, it is said:

"But where, as in the present case, they [steamer and sail vessel] are brought suddenly and unexpectedly close to each other, and the ordinary rules of navigation will not prevent a collision, it is the duty of each to act according to the emergency, and take any measure that will be most likely to attain the object."

In the case of The Sunnyside, 91 U. S. 208, 222, in reference to the obligation in such circumstances "not to neglect any of the precautions required by the ordinary practice of seamen" (old article 20, present articles 27, 29), Mr. Justice Clifford in delivering the opinion of the court, says:

"Cases arise in navigation where a stubborn adherence to a general rule is a culpable fault, for the reason that every navigator ought to know that rules of navigation are ordained not to promote collisions, but to save life and property by preventing such disasters."

See, also, The New Champion, 1 Abb. Adm. 208, Fed. Cas. No. 10,-146; The Cornelius C. Vanderbilt, 1 Abb. Adm. 361, Fed. Cas. No. 3,235; The A. Denike, 3 Cliff. 117, 122, Fed. Cas. No. 8,045; The Anglo Indian, 2 Marit. Law Cas. 239; The W. C. Redfield, 4 Ben. 227, 234, Fed. Cas. No. 17,305; The America, 92 U. S. 432, 438; The Columbia, 23 Blatchf. 268, 25 Fed. 844, and cases there cited; The Minnie C. Taylor, 52 Fed. 326; The R. H. Waterman, 82 Fed. 482; The George S. Shultz, 28 C. C. A. 476, 84 Fed. 508, 512.

New emphasis has been given to this well-settled rule by the act of congress, approved May 28, 1894 (2 Supp. Rev. St. p. 189), by which article 21, requiring the privileged vessel to keep her course and speed, was amended as follows:

"Note. When, in consequence of thick weather or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision. (See articles twenty-seven and twenty-nine.)"

The facts leave no doubt that this was precisely the situation of the schooner in this case. From the moment the steamer was seen, collision was apprehended. The master says he saw the steamer was coming rapidly towards him. He had notice that the steamer was backing, by her backing signals. There was no doubt as to what she was trying to do. She was approaching at nearly right angles and on the lee beam—the best position for a safe maneuver by the schooner. The situation was such that it was instantly self-evident, when the backing signal was given, that porting by the schooner could not possibly do any harm, and that it would certainly give the steamer more time and space for stopping. During the interval of

about two minutes between this and collision, the schooner advanced about 600 feet. She was sagging down towards the steamer; and by porting she would have luffed at least some three points, and thereby not only have prevented this sagging, but by her momentum would have run to windward and thus have drawn to the westward much more than the 50 or 75 feet that would have sufficed to enable the steamer to back away from her.

The present case is wholly different from those in which the sailing vessel is approaching the steamer nearly head on, when it is uncertain on which side of her the steamer may be designing to go. In those cases the sailing vessel must keep her course, since any change might thwart the steamer's maneuvers. The Farnley, 8 Fed. 629; The Dorian, 68 Fed. 1018; The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468; Donnell v. Towboat Co., 32 C. C. A. 331, 89 Fed. 758. Here there was no doubt, either as to what the steamer was trying to do, or as to the aid which the schooner might give without the least risk to herself, nor as to the necessity for this aid in the sudden emergency. I can hardly conceive of a situation in which the obligation of the privileged vessel to aid by her own maneuver was more obvious, or which more plainly falls within the very letter, as well as the spirit, of the amended rule.

The only excuses given by the master for not porting are, (1) that he had "no time to tack"; and (2) that the steamer should have starboarded and gone ahead of him at full speed. The latter, however, would have been not only a dangerous, but a forbidden maneuver. In the short time and space available to the steamer, she could not possibly have avoided collision in that way. It is certain that had she attempted it, a more dangerous collision would have resulted. She made no such attempt. Her backing signal was heard by the master, and from this he knew or ought to have known, that she was reversing. His duty under these circumstances was not a question of tacking, but only of porting and luffing two or three points, and running by the schooner's own momentum a length or a length and a half to windward. No attempt to do this or any preparation for it, was made by the master. Complete tacking was not necessary; though the ship tacked two hours before in a lighter breeze, and again immediately after collision. If more effective tacking had been required than was in fact needed in this instance, the men should have been properly stationed for the purpose of quickly handling the sails as soon as the steamer's whistle was heard near. The schooner was not in extremis; or if so, only by her own lack of preparation. The Elizabeth Jones, supra. The slight aid needed by porting was the simplest, the easiest and the most natural of all maneuvers in the "ordinary practice of seamen." Article 20. For the schooner's failure in this regard she can recover but half damages.

Decree accordingly.